**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Ronald BERKOWITZ, Paul D'Alessandro, Kevin Van Coughnett, Bisan Vafaie, and Wendall Howell, Defendants-Appellants.**

**No. 80–5537.**

United States Court of Appeals,
Fifth Circuit.*
Unit B

Dec. 7, 1981.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Entin, Schwartz, Angert & Dion, Ronald A. Dion, North Miami Beach, Fla., for Berkowitz.

Nancie G. Severs, Fort Lauderdale, Fla., for Coughnett.

Marc S. Nurik, John F. O'Donnell, Plantation, Fla. (Court-Appointed), for Vafaie and D'Alessandro.

Stuart A. Tarlowe, Fort Lauderdale, Fla. (Court-Appointed), for Howell.

Bruce A. Zimet, Asst. U. S. Atty., Fort Lauderdale, Fla., for plaintiff-appellee.

Before MORGAN, TJOFLAT and ANDERSON, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

We are called upon to decide the appeals of five criminal defendants convicted after a jury trial in the Southern District of Florida of conspiracy to distribute cocaine, possession with intent to distribute cocaine, and distribution of cocaine, in violation of 21 U.S.C.A. §§ 841(a)(1), 846, and 18 U.S.C.A. § 2 (West 1976). Appellants raise several overlapping and individual points concerning denial of motions for severance, limiting cross-examination of a government witness, suppression of evidence, conduct of counsel for some co-defendants, and sentences imposed by the trial court. After careful consideration, we reject all of appellants' contentions and affirm the district court.

## I. FACTS.

Sometime in the spring or summer of 1979, defendant-appellant Bisan Vafaie through a mutual friend met the government's confidential informant Ralph Nieves at a New York discotheque. Vafaie, of course, at that time was unaware of Nieves' activities as a confidential informant. Nieves asked Vafaie whether Vafaie knew where a quantity of cocaine might be procured. Vafaie responded that his roommate might be of some assistance and gave Nieves the telephone number of Vafaie's apartment in New Haven, Connecticut. Thereafter, confidential informant Nieves contacted Vafaie and Vafaie's roommate, defendant-appellant Kevin Van Coughnett, and set up a meeting in New Haven on October 15, 1979, between Vafaie, Van Coughnett, Nieves, and special agent Michael Pavlick. Special agent Pavlick, operating in an undercover capacity, was presented to Vafaie and Van Coughnett as a buyer seeking a source of cocaine. Pavlick, Nieves, Vafaie and Van Coughnett arranged a trip to Florida where Van Coughnett would introduce Nieves and a colleague of Pavlick's to a supplier of cocaine.

Following several telephone calls and a luncheon meeting in New York, confidential informant Nieves, appellant Vafaie, and appellant Van Coughnett on October 18, flew to Ft. Lauderdale, Florida. The three were greeted at the Ft. Lauderdale airport by special agent William Silvestri, who was introduced as special agent Pavlick's contact in Florida. Vafaie, Nieves, and Silvestri went to the Ft. Lauderdale Beach Club where they were joined shortly by Van Coughnett and his friend, defendant Pat Haughey.[1] Haughey subsequently brought Van Coughnett to defendant Edward Korp's[2] house and Van Coughnett returned to the Beach Club to lead Silvestri and Nieves to Korp's house. Korp brought Silvestri and Nieves to the house of the source of supply, apartment number 207 in the Hidden Harbor Condominium in Ft. Lauderdale where a kilogram of cocaine was to be delivered to Silvestri. Inside this apartment were defendant-appellant Paul D'Alessandro, defendant-appellant Wendall Ho-

---

1. Haughey was tried and convicted in the district court with the other defendants, but has not pursued an appeal to this court.

2. Defendant Korp was indicted with the appellants, but pled guilty before the trial below commenced.

well,[3] defendant Charles Hovan,[4] and defendant Vincent Anzelone,[5] who were all sitting around the coffee table on which there was a sample of cocaine. Special agent Silvestri conducted a field bleach test on the sample of cocaine and concluded that it was cocaine. Confidential informant Nieves and all of the defendants present snorted some of the sample. Each of the defendants in the apartment commented on the high quality of the cocaine.

Special agent Silvestri then inquired about the kilogram of cocaine and was informed by appellant D'Alessandro that this would not be produced until Silvestri showed the purchase money. Silvestri discussed with Howell, D'Alessandro, Anzelone, Korp, and Hovan the risk and equities of producing the cocaine or the purchase money first. Eventually, appellant D'Alessandro placed a telephone call and, accompanied by defendant Anzelone, left the apartment to get the kilogram.

While D'Alessandro was gone, Hovan received at the apartment a telephone call from D'Alessandro inquiring whether a scale to weigh the cocaine could be obtained. Appellant Howell responded by placing a telephone call and stating that he could secure a scale. Howell then left the apartment and returned with a paper bag which contained a scale.

Upon departing the apartment, D'Alessandro and Anzelone were observed by surveillance agents to travel in a blue Datsun automobile to the home of defendant-appellant Ronald Berkowitz in Tamarac. During this trip, the surveillance agents lost sight of the Datsun for about five to ten minutes and reestablished surveillance of the car when they located it parked in the driveway of Berkowitz' house. About fifteen minutes after resuming surveillance, the agents saw D'Alessandro, who was carrying a package under his arm, and Berkowitz

leave the house and enter the Datsun. D'Alessandro placed the package behind the driver's seat and seated himself in the driver's seat; Berkowitz sat in the passenger seat. The agents followed the Datsun back to the Hidden Harbor Condominium where D'Alessandro, carrying the package, and Berkowitz entered apartment 207. Still waiting in the apartment were special agent Silvestri, confidential informant Nieves and defendants Howell, Korp and Hovan.

D'Alessandro placed the package that he had been carrying on the table and stated that it was the kilogram of cocaine. Special agent Silvestri, assisted by Berkowitz, began to unwrap the package and to examine its contents. Silvestri conducted another field test on the contents of the package and concluded that it was cocaine. Appellant Berkowitz at this point took a razor blade and cut the chunks of cocaine to demonstrate its quality. Berkowitz also pressed the cocaine with his finger and commented on the cocaine's softness and quality.

Silvestri told the defendants that he would take the cocaine, and left the apartment on the pretense of obtaining the purchase money and buying plastic bags to use to weigh the cocaine. Berkowitz, D'Alessandro, Howell, Hovan, Korp, confidential informant Nieves and the cocaine remained inside the apartment. Special agent Silvestri returned to the apartment with several other agents and obtained entry by maintaining his undercover role (i. e., the buyer of the cocaine). Once admitted to the apartment, special agent Silvestri and the other agents identified themselves as law enforcement agents, arrested all of the defendants present, and seized the cocaine which had remained in plain sight on the table. The remaining defendants not present in the apartment were subsequently

---

**3.** Howell, who alone questions the sufficiency of the evidence, introduced himself to Silvestri by stating that he (Howell) "was just a middleman" who brought D'Alessandro and Anzelone to Hovan's apartment.

**4.** Defendant Hovan was indicted with the appellants, but pled guilty before the trial below commenced.

**5.** Defendant Anzelone was tried with the appellants, but the jury was unable to reach a verdict as to him.

arrested at various locations in the Ft. Lauderdale area.

## II. SEVERANCE.

 The point pressed most strenuously on appeal by appellants Vafaie, Van Coughnett, D'Alessandro, and Howell is that the district court committed reversible error in failing to grant one or more of the defendants' motions for severance. Although none of the appellants made a pretrial motion for severance, numerous motions for severance were made throughout the trial. The failure to move for severance before trial, of course, is not fatal to appellants' claims.. The district court has a continuing duty to monitor the entire trial for prejudice and to order severance if such prejudice does arise. *Schaffer v. United States*, 362 U.S. 511, 516, 80 S.Ct. 945, 948, 4 L.Ed.2d 921 (1960); *United States v. Clark*, 480 F.2d 1249, 1252 (5th Cir.), *cert. denied*, 414 U.S. 978, 94 S.Ct. 301, 38 L.Ed.2d 222 (1973). The district court denied all of the defendants' motions for severance.

 Appellants do not contest that joinder was proper under Fed.R.Crim.P. 8(b). Appellants instead claim that they were prejudiced by their joint trial and entitled to relief under Fed.R.Crim.P. 14.[6]

Under Rule 14, the decision to grant a severance is committed to the sound discretion of the district court. *United States v. Crawford*, 581 F.2d 489, 491 (5th Cir. 1978); *United States v. Swanson*, 572 F.2d 523, 528 (5th Cir.), *cert. denied*, 439 U.S. 849, 99 S.Ct. 152, 58 L.Ed.2d 152 (1978). In deciding a motion for severance, the district court must balance the potential prejudice to the defendant against the public interest in joint trials where the case against each defendant arises from the same general transactions. The judgment of the district court in assessing this balance will not be disturbed absent an affirmative showing of abuse of discretion. *United States v. Swanson*, 572 F.2d at 528; *United States v. Martinez*, 466 F.2d 679, 686 (5th Cir. 1972), *cert. denied*, 414 U.S. 1065, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973). On appeal from the denial of a motion for severance, an appellant "must show something more than the fact that 'a separate trial might offer him a better chance of acquittal.'" *Tillman v. United States*, 406 F.2d 930, 935 (5th Cir.), *vacated in part on other grounds*, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969). *See also United States v. Dennis*, 645 F.2d 517, 521 (5th Cir. 1981). To secure a reversal, more than some prejudice must be shown; the appellant must demonstrate that he received an unfair trial and suffered compelling prejudice against which the trial court was unable to afford protection. *United States v. Sheikh*, 654 F.2d 1057, 1065 (5th Cir. 1981); *United States v. Perez*, 489 F.2d 51, 65 (5th Cir. 1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). With these considerations in mind, we turn to the claims of the appellants.

### A. *Vafaie—Van Coughnett Motions for Severance.*

Appellants Vafaie and Van Coughnett contend that they should have been tried separately because of their mutually antagonistic defenses. Both defendants testified at trial and, although some antagonism between the two was manifest, both presented remarkably similar defenses. Each attempted to minimize his own involvement, and denied joining or participating in the conspiracy. Each one described his role as simply making an initial introduction and cast the other as the more active participant. Vafaie and Van Coughnett each attempted to characterize himself as merely a "knowing bystander."

In many particulars, Vafaie and Van Coughnett's versions of what happened are quite consistent. Vafaie and Van Coughnett agree that Van Coughnett met confidential informant Nieves through Vafaie

---

6. Fed.R.Crim.P. 14 provides, in pertinent part:
 If it appears that a defendant . . . is prejudiced by a joinder . . . of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

and that through Nieves both met special agent Pavlick. Neither Vafaie nor Van Coughnett dispute that as a result of this meeting Van Coughnett agreed to introduce Nieves and the colleague of Pavlick's to a friend of Van Coughnett's in Florida for the purpose of aiding Pavlick in obtaining a quantity of cocaine. Vafaie and Van Coughnett both testified that pursuant to this arrangement, they and confidential informant Nieves traveled to Florida and the aforementioned introduction was indeed made. Both admit to being present and to participating to some degree at various meetings in New York, New Haven, and Florida. The testimony of Vafaie and Van Coughnett converges on many other details.

Vafaie and Van Coughnett disagree, however, on their respective degree of participation in the above-mentioned conversations (and in some instances on the substance of the conversations). Vafaie casts himself as a passive bystander to these transactions, at times distracted by other pursuits (e. g., eating, watching television), at times quietly observing what transpired, while Van Coughnett, in Vafaie's view, actively participated in the drug-related dealings. Van Coughnett, in turn, contends that his involvement was at the periphery of these events, that he became involved at the behest of Vafaie, and that, between the two of them, Vafaie was the major culprit.

Vafaie and Van Coughnett also presented different explanations as to how each became involved. Van Coughnett testified that Vafaie desperately needed money to repay $6,000 that was entrusted to Vafaie by an uncle. According to Van Coughnett, Vafaie first conceived of the idea of arranging a drug sale after reading an article in *Rolling Stone* magazine entitled "Cocaine Cowboys." Van Coughnett claimed that he agreed to introduce Vafaie's friend (confidential informant Nieves) to Van Coughnett's friend (defendant Pat Haughey) solely as a personal favor to his roommate Vafaie. Van Coughnett testified that he was to receive no compensation for his assistance, but implied that Vafaie was to share in some way in the drug sale proceeds. Vafaie, for his part, denied that he originated the idea of arranging a drug sale and that he owed his uncle money. Vafaie stated that he told Van Coughnett the story about owing an uncle money for the purpose of demurring on a loan request by Van Coughnett. Vafaie testified to the effect that his connection with the events leading to the sale in Florida was simply to give his telephone number to confidential informant Nieves, and implied that once contacted by Nieves any impetus for furthering the transaction came from Van Coughnett. According to Vafaie, his reason for giving his telephone number to Nieves, knowing the latter wanted it for the purpose of locating a supply of cocaine, was to do a favor for Nieves (and, perhaps, by implication, for Van Coughnett).

■ Defendants Vafaie and Van Coughnett, thus, did present to some extent antagonistic defenses and each probably suffered some prejudice from being tried with the other. But a mere showing of some antagonism and prejudice is insufficient to require overturning a denial of severance by the district court. *United States v. Crawford*, 581 F.2d 489, 491 (5th Cir. 1978); *United States v. Perez*, 489 F.2d 51, 65 (5th Cir. 1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). In this circuit, to compel severance the defenses must be more than merely antagonistic— they must be antagonistic to the point of being mutually exclusive, *United States v. Marable*, 574 F.2d 224, 231 (5th Cir. 1978); *United States v. Wilson*, 500 F.2d 715, 723 (5th Cir. 1974), *cert. denied*, 420 U.S. 977, 95 S.Ct. 1403, 43 L.Ed.2d 658 (1975), or irreconcilable, *United States v. Mota*, 598 F.2d 995, 1001 (5th Cir. 1979), *cert. denied*, 444 U.S. 1084, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1980); *United States v. Swanson*, 572 F.2d 523, 529 (5th Cir.), *cert. denied*, 439 U.S. 849, 99 S.Ct. 152, 58 L.Ed.2d 152 (1978). *See United States v. Crawford*, 581 F.2d at 491.

The test for when antagonistic defenses are irreconcilable or mutually exclusive has been expressed in various forms. Some courts have looked to whether each defendant "was the government's best witness

against the other." *United States v. Crawford*, 581 F.2d at 492; *United States v. Johnson*, 478 F.2d 1129 (5th Cir. 1973). Also considered in this regard are whether each defendant had to confront hostile witnesses presented by a co-defendant and whether witnesses against the defendant were examined by one adversary (*i. e.*, the government) and cross-examined by another (*i. e.*, the co-defendants). *United States v. Crawford*, 581 F.2d at 492.

The test, however, goes further than merely examining whether a defendant is subjected to a co-defendant's hostile witnesses and adverse cross-examinations, which might occur in every case of antagonistic, but not mutually exclusive, defenses. The court in *United States v. Bynum*, 566 F.2d 914, 926 (5th Cir.), *cert. denied*, 439 U.S. 840, 99 S.Ct. 129, 58 L.Ed.2d 138 (1978), in rejecting the claim that severance was mandated by mutually exclusive defenses noted that it was "not essential to [one defendant's] defense, that the jury find [another defendant] guilty of the substantive offenses." Moreover, that two defendants may completely disagree on some detail of the facts is not sufficient to compel severance. In *United States v. Sheikh*, 654 F.2d 1057, 1065 (5th Cir. 1981), the appellant and a co-defendant both contended that they had no knowledge that heroin was hidden in a Koran display case that each had possessed. The appellant and the co-defendant, however, each claimed that the other was the owner of the case. The court held that, while with respect to ownership of the case the two defenses were so antagonistic as to be irreconcilable and mutually exclusive, the "essence" or "crux" of the defenses was not antagonistic, and thus neither defendant suffered the compelling prejudice that would require severance.

Synthesizing these decisions, we hold that the defense of a defendant reaches a level of antagonism (with respect to the defense of a co-defendant) that compels severance of that defendant, if the jury, in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant. In such a situation, the co-defendants do indeed become the government's best witnesses against each other. Where two defendants present defenses that are antagonistic at their core, a substantial possibility exists " 'that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.' " *United States v. Eastwood*, 489 F.2d 818, 822 n.5 (5th Cir. 1973) (quoting *United States v. Robinson*, 432 F.2d 1348, 1351 (D.C.Cir. 1970)). If the essence of one defendant's defense is contradicted by a co-defendant's defense, then the latter defense can be said to "preempt" the former. *See United States v. Swanson*, 572 F.2d 523, 529 (5th Cir.), *cert. denied*, 439 U.S. 849, 99 S.Ct. 152, 58 L.Ed.2d 152 (1978) (no severance required because defense of noninvolvement did not "preempt" defense of lack of intent). This sort of conflict between defendants creates the compelling prejudice that mandates severance. Such compelling prejudice does not arise with respect to a defendant where the conflict concerns only minor or peripheral matters which are not at the core of his defense. Ultimately, the test is whether the defendant received a fair trial.

Applying this test to the present case, we hold that the essence or core of each defendant's defense—noninvolvement in the criminal activity—was not in conflict, and indeed could be construed to be quite consistent, *i. e.*, neither were criminally involved. Although the defendants concededly disagree on some details, neither defendant's defense required the jury to find the other guilty. Nor was it necessary for the jury, in order to believe the core of testimony offered on behalf of one defendant, to disbelieve testimony offered on behalf of the other defendant. The jury, if it chose to discredit the government's case, could have concluded that Vafaie's involvement ended with giving his telephone number to confidential informant Nieves and that Van Coughnett's conduct was similarly limited to making an initial introduction, so that neither had the intent to join in the conspiracy alleged in the indictment. Considering

the testimony offered by each defendant, the jury rationally could have accepted the defense theory of both, of only one, or of neither.[7] We cannot say that we are left with a definite and firm conviction that the district court abused its discretion. In fact, we note that the district court made numerous efforts to protect the defendants from undue prejudice. The trial court frequently cautioned defense counsel to refrain from gratuitous attacks against other defendants and restricted or excluded testimony of questionable relevance to the defense of one defendant that was prejudicial to another defendant. In sum, we cannot say that the joint trial of defendants Vafaie and Van Coughnett denied either a fair trial.

### B. D'Alessandro and Howell Motions for Severance.

#### 1. Jury Confusion.

■ Appellants D'Alessandro and Howell claim that they suffered "spill-over" prejudice from the Vafaie—Van Coughnett conflict. In essence, their argument is that this conflict, combined with trying seven defendants together, resulted in jury confusion that denied D'Alessandro and Howell a fair trial. This argument is without merit.

No evidence has been cited that would support the claim that the jury was confused. The trial court properly instructed the jury that they were to consider separately the evidence offered against each defendant. *See United States v. Perez*, 489 F.2d 51, 66–67 (5th Cir. 1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). Indeed, the jury refused to return a verdict against one of the defendants (Vincent Anzelone) present in the Hidden Harbor Condominum whose connection to the conspiracy was only marginally established by the evidence. Such a verdict supports the inference that the jury meticulously sifted the evidence; there is no reason to believe otherwise. *See Tillman v. United States*, 406 F.2d 930, 936 (5th Cir.), *vacated in part on other grounds*, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969).

■ Even if some confusion did exist, we have difficulty understanding how this would prejudice D'Alessandro and Howell. Given the overwhelming evidence against D'Alessandro and Howell, any confusion at trial could have only inured to their benefit. The government's brief quite aptly describes D'Alessandro's decision to maintain a low profile at trial as a tactic "saturated with intelligence."[8] Similarly, Howell has

---

**7.** The most troubling aspect of the antagonism between the defenses of Vafaie and Van Coughnett is the claim by each that he did not intend to profit from the transaction, but acted as a favor to the other, and the implication that the other expected to profit from the deal. This antagonism is mitigated somewhat by the admission of Vafaie that confidential informant Nieves offered to pay for Vafaie's trip to Florida and by Van Coughnett's claim that Vafaie paid for Van Coughnett's airplane fare and hotel room. (Vafaie denies paying for Van Coughnett's airplane fare but admits paying for the first night in the hotel. This dispute, however, does not alter the fact that Van Coughnett, in his own defense, admits to receiving some benefit in connection with the transaction in Florida.) When considered in light of this testimony, the conflict over *who* profited from the transaction really becomes a dispute over *how much* each received. Such a disagreement would at best be at the periphery, rather than the core, of each defendant's defense of noninvolvement and lack of criminal intent.

**8.** D'Alessandro attempts to document that he suffered prejudice from the joint trial by comparing the number of pages in the entire trial transcript with the number of pages of the transcript devoted to the government's case directly against him. On the facts of this case, this quantitative analysis is of no value to the court. Although in some circumstances great disparities in the weight of the evidence against different defendants may, in the presence of other indicia of jury confusion, reveal sufficient prejudice to require severance, *United States v. Wasson*, 568 F.2d 1214, 1222–23 (5th Cir. 1978), merely "[d]emonstrating that the evidence is stronger against a co-defendant than oneself does not satisfy the burden of showing *compelling* prejudice." *United States v. Marable*, 574 F.2d 224, 231 (5th Cir. 1978) (emphasis in original); *United States v. Partin*, 552 F.2d 621, 641 (5th Cir.), *cert. denied*, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977). Here, D'Alessandro has failed to make even the lesser, and albeit inadequate, showing that the evidence is stronger against the co-defendant. While in a chronological depiction of the conspiracy, D'Alessandro's appearances may be brief, his role in the conspiracy was central and the evidence against him was overwhelming.

made no showing of any prejudice whatsoever, let alone compelling prejudice necessary to require reversing the district court's denial of severance.

█ Howell also argues that the similarity between the names of defendants Howell, Hovan and Haughey may have engendered confusion in the jury. This position has no merit. As previously noted, the trial judge carefully cautioned the jury to evaluate separately the evidence relevant to each defendant. During the trial, the judge required that each defendant and his respective counsel stand and identify themselves in order to assist the jury. Hovan had pled guilty and thus was not tried with Howell. Howell and Haughey's roles in the conspiracy were entirely distinct; indeed, the two were never in each other's presence during the course of the conspiracy. During the trial, references to these defendants often included their first names (*i. e.*, Wendall Howell, Charles Hovan, and Pat Haughey). We find no basis for concluding that the similarity of the three defendants' names confused the jury and caused an unfair trial.

2. Comments on the Right to Remain Silent.

█ Appellants D'Alessandro and Howell also contend that they were entitled to severance under *de Luna v. United States*, 308 F.2d 140 (5th Cir. 1962), because statements in summation by counsel for co-defendant Van Coughnett and by the prosecutor amounted to impermissible comments on the failure of these appellants to testify. This circuit has firmly established the rule that convictions can be overturned where a comment on a defendant's exercise of his right to remain silent impairs the integrity of that Fifth Amendment right. Moreover, reversal has been required even when the comment was made by someone other than the prosecutor. *See United States v. Aguiar*, 610 F.2d 1296, 1302 (5th Cir. 1980), *cert.*

*denied*, 449 U.S. 827, 101 S.Ct. 91, 66 L.Ed.2d 31 (1981); *United States v. Kaplan*, 576 F.2d 598, 600 (5th Cir. 1978), *cert. denied*, 439 U.S. 1078, 99 S.Ct. 858, 59 L.Ed.2d 47 (1979); *de Luna v. United States*, 308 F.2d at 141. However, not every statement that under some conceivable interpretation might draw attention to a defendant's decision not to testify is a comment on silence. "[T]he test in determining whether or not a statement is a comment on the failure of a defendant to testify is whether or not the statement was manifestly intended or was of such character that a jury would rationally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Wilson*, 500 F.2d 715, 721 (5th Cir. 1974), *cert. denied*, 420 U.S. 977, 95 S.Ct. 1403, 43 L.Ed.2d 658 (1975).

█ Appellants D'Alessandro and Howell [9] contend that in closing arguments counsel for co-defendant Van Coughnett commented on the failure of these appellants to testify by stating:

So I ask you to evaluate and weigh in Kevin's [Van Coughnett] favor the fact that he took the stand in his own defense and he did not have to. He did not have to present any evidence whatsoever.

Record on Appeal, vol. IV, at 1182. This statement was not manifestly intended, nor would a jury rationally and necessarily construe it, to be a comment on silence. The most plausible explanation for this statement is that it was an attempt to curry sympathy from the jury on behalf of Van Coughnett, to bolster his testimony, and to enhance his credibility. *See United States v. Macker*, 608 F.2d 223, 226–27 (5th Cir. 1979). This court has held that:

A mere favorable comment upon the fact that one of several co-defendants testified does not involve the same potential for prejudice as an adverse comment by counsel upon the failure to testify of the other co-defendant. We decline to extend *DeLuna* to cover that situation.

**9.** Although both D'Alessandro and Howell raise this point on appeal, only Howell objected at trial and seasonably moved for severance or a mistrial. Since we decide that failure to grant

Howell's motion for severance or a mistrial was not error, *a fortiori*, no plain error was committed as to D'Alessandro.

*United States v. Hodges*, 502 F.2d 586, 587 (5th Cir. 1974). The statement at issue here is a favorable comment on the fact that Van Coughnett testified and not an adverse comment on Howell's or D'Alessandro's failure to testify. Furthermore, the district court substantially mitigated any possible prejudice by immediately giving *sua sponte* a curative instruction that a defendant has the right not to testify and that no adverse inference may be drawn from the exercise of this right.

 Howell also claims that the government commented on his silence by arguing in summation that:

It's not the report [of the Drug Enforcement Administration agents] that's evidence. Mr. Tarlowe [counsel for Howell] is not correct. All Mr. Zimet [Assistant United States Attorney] has to do is introduce Mr. Silvestri's report and that rebuts what was brought out on his case. It's not the reports . . . it's not the reports that's evidence; it's the testimony.

Record on Appeal, vol. IV, at 1266. An objection to this characterization of the evidence was promptly sustained by the court on the ground that the reports of the DEA agents had been admitted into evidence. The prosecutor acknowledged his error in characterizing the evidence and proceeded to argue that the agents' testimony at trial should be given greater weight than the reports prepared by these agents. This statement manifestly was not intended nor could it be reasonably understood as a comment on silence. Rather, the government was attempting to rebut defense efforts at impeaching the testimony of these agents by showing inconsistencies with their reports. The government simply was urging the jury to give greater credence to the live testimony of the agents than to their reports, a perfectly permissible argument.

3. Mention of the Guilty Pleas of Absent Co-Defendants.

 D'Alessandro also argues that a question propounded by counsel for co-defendant Berkowitz, inquiring whether defendants Korp and Hovan had pled guilty, prejudiced D'Alessandro and denied him a fair trial. Prior to this question by counsel for Berkowitz, the court during a sidebar conference had discussed with counsel whether or not the jury should be informed that Korp and Hovan had pled guilty. At the conclusion of that conference, the court cautioned the jury that they should not consider or speculate about why persons mentioned in the testimony were not present at trial. When the question was posed by counsel for Berkowitz, the *prosecutor* immediately objected. During the bench conference that ensued, D'Alessandro stated his objection to the question and moved for severance or a mistrial. These motions were denied. The trial judge sustained the objection and instructed the jury to disregard the question. The prosecutor proposed a further curative instruction but this was opposed by counsel for D'Alessandro.

In light of these facts, we hold that the asking of the question did not deprive D'Alessandro of a fair trial. The question was never answered and the jury was instructed to disregard it. The case is unlike *United States v. Miranda*, 593 F.2d 590 (5th Cir. 1979); *United States v. Corona*, 551 F.2d 1386 (5th Cir. 1977); and *United States v. Hansen*, 544 F.2d 778 (5th Cir. 1977), cited in appellant D'Alessandro's brief. In those cases, the prosecutor or the court affirmatively and gratuitously told the jury that the absent co-defendant had pled guilty. Here the jury had before them only a question posed by a co-defendant, and the prosecutor and the court did everything possible to protect the appellants from prejudice. The government objected in time to prevent an answer to the question to come before the jury, and suggested a curative instruction that was rejected by appellant D'Alessandro. The court sustained the objection, instructed the jury to disregard the question, and twice cautioned the jury that they should not consider why the persons mentioned were not present at trial. If we were to grant D'Alessandro a new trial on these facts, we would be inviting collusion and gamesmanship by future defendants seeking to manufacture their own mistrial.

We decline to create an incentive for this sort of misconduct.[10]

### III. LIMITATION ON CROSS-EXAMINATION.

Appellants Howell, D'Alessandro and Van Coughnett next complain that their Sixth Amendment rights to confrontation were violated when the district court limited their cross-examination of special agent Silvestri. In particular, the appellants sought to impeach Silvestri's identification of the scale Howell supposedly brought into the apartment. Appellants contend that the scale Silvestri identified and that was introduced into evidence against them was not seized from the Hidden Harbor Condominium on the night of the cocaine sale. Instead, appellants claim, the government erroneously introduced and Silvestri identified another scale that had been seized a few days later from the home of defendant Berkowitz. The government objected at the beginning of Howell's cross-examination on this point on the ground that Berkowitz had not had the opportunity to litigate the legality of the search and that revealing that a scale had been seized from the Berkowitz house might violate Berkowitz' Fourth Amendment rights. The district court sustained this objection.

We do not doubt for a moment that cross-examination constitutes a vital component of the Sixth Amendment right of a criminal defendant to confront witnesses against him. Significant restrictions on cross-examination can eviscerate this right and compel reversal. *Davis v. Alaska*, 415 U.S. 308, 315–18, 94 S.Ct. 1105, 1109–1111, 39 L.Ed.2d 347 (1974); *United States v. Summers*, 598 F.2d 450, 460 (5th Cir. 1979). However, once a defendant has been afforded the opportunity for sufficient cross-examination to satisfy the Sixth Amendment guarantee, the district court has dis-

cretionary authority to control the scope of further cross-examination. *Greene v. Wainwright*, 634 F.2d 272, 275 (5th Cir. 1981); *United States v. Elliott*, 571 F.2d 880, 908 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). What amount of cross-examination satisfies the Sixth Amendment requirement is not measured by a quantitative test, but rather by a pragmatic, qualitative approach: The defendant must be allowed the opportunity "to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Davis v. Alaska*, 415 U.S. at 318, 94 S.Ct. at 1111; *United States v. Elliott*, 571 F.2d at 908–09.

After carefully examining the record, we conclude that the district court did not deny appellants the opportunity to expose facts from which the jury might draw inferences about the reliability of the witness. The government was concerned that this line of questioning might have revealed Berkowitz' name or the location of the seizure, the legality of which had not been litigated, and might have substantially prejudiced Berkowitz, violated his constitutional rights, and denied him a fair trial. Based on this concern, the government made its objection, which was in effect a motion in limine,[11] as Howell began questioning on this point. This was the objection that the trial court sustained. As such, the appellants could inquire into the existence of another scale and the alleged misidentification by special agent Silvestri, so long as they did not expose Berkowitz' name or the location of the possibly illegal seizure. The court's response to appellant D'Alessandro's explanation of why he wanted to pursue this issue reveals that the court did not limit cross-examination any further than

---

**10.** We express no opinion on whether in other circumstances severance might be required when a co-defendant reveals to the jury that another co-defendant has pled guilty.

**11.** If the government had waited to object until Berkowitz' name or the search location was actually mentioned, a favorable ruling and a

cautionary instruction at that time might not have cured the possible prejudice to defendant Berkowitz. The government in this instance quite properly acted to prevent the prejudice from occurring rather than rely on paliative measures.

the minimal restriction on divulging Berkowitz' name or the search location:

> Mr. Gromet [trial counsel for D'Alessandro], you can make your argument and you can make your questioning without creating a mistrial situation, as far as Berkowitz is concerned.

Record on Appeal, vol. II, at 404. D'Alessandro in fact subsequently cross-examined Silvestri about the scale and no objection directed to the scope of this inquiry was made. Record on Appeal, vol. II, at 545–47.[12] D'Alessandro was also permitted to ask special agent Billy Joe Church whether Church's testimony before the grand jury about the scale differed from Silvestri's testimony at trial. Record on Appeal, vol. III, at 709–10.[13]

The district court properly limited cross-examination in this regard to avoid prejudice to defendant Berkowitz. The location of the second seizure or Berkowitz' connection to it had no probative value for impeaching Silvestri or establishing that the wrong scale had been introduced into evidence. Appellants' impeachment purposes could have been satisfied without revealing facts highly prejudicial to defendant Berkowitz. The district court's ruling afforded appellants the opportunity to conduct such a cross-examination. In *United States v. Summers*, 598 F.2d 450 (5th Cir. 1979), the district court had precluded the defendant from eliciting on cross-examination the names of city councilmen, other than the defendant, who had participated in an alleged kickback scheme because the district court did not want to jeopardize a then ongoing grand jury investigation. We affirmed that ruling, reasoning that the defendant was permitted adequate opportunity to establish the existence of those other participants and the prohibition of revealing the names was not a violation of the Sixth Amendment nor an abuse of discretion. *Id.* at 459–63. *See also Alford v. United States*, 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931) (dictum) (The court has an obligation to protect the witness from invasion of his right against self-incrimination and from questions propounded merely to harass or embarrass him); *United States v. Contreras*, 602 F.2d 1237, 1239 (5th Cir.), *cert. denied*, 444 U.S. 971, 100 S.Ct. 466, 62 L.Ed.2d 387 (1979) (Court could properly disallow disclosure of undercover agent's address where such information sought would endanger the safety of the witness or his family). Similarly, in the present case, the value of any information that the court's ruling prevented appellants from eliciting was minimal and the reasons for imposing the restriction on cross-examination were weighty. We conclude that the district court neither violated the constitutional right of appellants nor abused its discretion in so limiting cross-examination.

## IV. SUFFICIENCY OF THE EVIDENCE AGAINST APPELLANT HOWELL.

 Appellant Howell also challenges the sufficiency of the evidence against him. We have examined the record and conclude that this contention is without merit. The record is replete with more than sufficient evidence to sustain Howell's convictions.

## V. SUPPRESSION OF EVIDENCE.

 Although all of the defendants sought to suppress the cocaine seized from

---

**12.** Objections to D'Alessandro's questioning were, however, made and sustained on hearsay and form of the question grounds.

**13.** Appellants argue that the district court's initial ruling was broader than merely prohibiting mention of Berkowitz' name or the search location; they contend that the court precluded broaching the entire area of the alleged misidentification. Although the trial judge did express his opinion that this line of inquiry would probably be of little impeachment value, his response to D'Alessandro's argument (quoted, *supra*, in the text) and D'Alessandro's subsequent opportunity to cross-examine on this issue belies that the court intended a broad restriction on examination in this area. If appellants had any doubts about the scope of the district court's ruling, they should have requested a clarification, which they did not do. Appellants were given the opportunity to adequately cross-examine special agent Silvestri; that they did not fully avail themselves of this opportunity does not mean that they were deprived of any constitutional rights.

the Hidden Harbor Condominium, only appellant Howell claims error in the denial of the motion to suppress. In essence, Howell argues that when special agent Silvestri returned to the apartment, ostensibly with the purchase money, but in fact with other agents to arrest the defendants, Silvestri failed to announce his presence (*i. e.*, identify himself as a DEA agent) as required by 18 U.S.C.A. § 3109 (West 1976). This point is utterly devoid of merit. The facts concerning the seizure and the arguments urged for suppression are virtually identical to those presented in *United States v. Dohm*, 597 F.2d 535, 537–38 (5th Cir.), *cert. denied*, 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 196 (1979), *vacated on other grounds*, 618 F.2d 1169 (5th Cir. 1980) (en banc). *See also Sabbath v. United States*, 391 U.S. 585, 591 & n.8, 88 S.Ct. 1755, 1759 & n.8, 20 L.Ed.2d 828 (1968); *Ker v. California*, 374 U.S. 23, 37–41, 83 S.Ct. 1623, 1631–1634, 10 L.Ed.2d 726 (1963); *Id.* at 47, 83 S.Ct. at 1636 (Brennan, J.); *Miller v. United States*, 357 U.S. 301, 309, 78 S.Ct. 1190, 1195–1196, 2 L.Ed.2d 1332 (1958); *United States v. Metz*, 608 F.2d 147, 154–55 (5th Cir. 1979), *cert. denied*, 449 U.S. 821, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980); *United States v. Carter*, 566 F.2d 1265, 1268–69 (5th Cir.), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978); *United States v. DeFeis*, 530 F.2d 14, 15 (5th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 92, 50 L.Ed.2d 95 (1976); *Smith v. United States*, 357 F.2d 486, 488 n.1 (5th Cir. 1966). This point merits no further discussion.

## VI. SEPARATE SENTENCES FOR POSSESSION AND DISTRIBUTION.

Appellant Berkowitz does not challenge his conviction, but claims that he was improperly sentenced for both possession and distribution based on the same single transaction. Berkowitz contends that such multiple sentencing for possession and distribution arising out of a single transaction violates this court's en banc holding in *United States v. Hernandez*, 591 F.2d 1019 (5th Cir. 1979) (en banc). The court in *Hernandez*

held that Congress did not "intend to make a single delivery of narcotics punishable as two separate offenses—one, possession with intent to distribute and the other, the actual distribution. . . . When the intent to distribute was executed by a successful sale, the possession with intent to do so merged into the completed offense." *Id.* at 1021–22.

We must reject this contention for two reasons. First, since Berkowitz was convicted of conspiracy, his culpability extends to all substantive offenses committed in furtherance of that conspiracy. The jury, having found Berkowitz to have joined in the conspiracy, under the *Pinkerton* rule, could convict him of any substantive offense committed by a co-conspirator in furtherance of that conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *United States v. Hodges*, 606 F.2d 520, 523 (5th Cir. 1979), *cert. denied*, 444 U.S. 1035, 100 S.Ct. 708, 62 L.Ed.2d 671 (1980); *United States v. Johnson*, 575 F.2d 1347, 1366–67 (5th Cir. 1978), *cert. denied*, 440 U.S. 907, 99 S.Ct. 1213, 59 L.Ed.2d 454 (1979). Even assuming *arguendo* that Berkowitz did not independently possess the cocaine aside from the moment of delivery (*i. e.*, distribution), at the very least, convicted co-conspirator D'Alessandro, in furtherance of the conspiracy, possessed the cocaine prior to the actual distribution (*i. e.*, a separate and distinct transaction—*e. g.*, sometime between when he left the apartment and when he returned with the cocaine). Under the *Pinkerton* rule, Berkowitz is liable for these acts of possession committed by D'Alessandro.

Second, regardless of the existence of a conspiracy, *Hernandez* does not shield Berkowitz on the facts of this case from the imposition of separate sentences for possession and distribution. In *Hernandez*, the appellant and a confederate negotiated with undercover narcotics agents the sale of one ounce of heroin. The confederate alone, however, consummated the actual distribution of the heroin at a later time

when Hernandez was not present.[14] Hernandez, thus, was convicted of possession with intent to distribute and distribution of heroin based solely on his constructive possession at the time of distribution.[15] The en banc court remanded the case to the trial court for resentencing, stating:

> The sentence for possession with intent to distribute combined with the consecutive sentence for distribution imposes double punishment for conduct that, under the facts of this case, merges into a single offense. The evidence of the sale was relied upon to prove both Hernandez' constructive possession of the heroin and his intention to distribute it. There was no evidence of Pete's [Hernandez] possession of a controlled substance with the intent to distribute it apart from the evidence of the actual sale. When the intent to distribute was executed by a successful sale, the possession with intent to do so merged into the completed offense.

591 F.2d at 1022.

United States v. Foundas, 610 F.2d 298 (5th Cir. 1980), further refines the Hernandez rule. The appellant in Foundas met with undercover agents in a motel bar and arranged the sale of one or two kilograms of cocaine. The appellant disappeared briefly and then rejoined the agents in a motel room where she produced the cocaine. The court, noting the government's position that Foundas during her absence must have obtained the cocaine from a hiding place (Id. at 300), affirmed the separate sentences that Foundas received for possession with intent to distribute and distribution. Hernandez was distinguished:

> In Hernandez, the convictions were both based on the same act: Hernandez' friend sold heroin to DEA agents. Hernandez was convicted separately for possession with intent to distribute and distribution (even though the only evidence of possession was his constructive possession at the time of distribution). In this case, Ms. Foundas admitted telling the DEA agent that she had cocaine; she disappeared at one point to get it; and she produced cocaine from her purse at the appropriate moment. The possession in this case was separate from the actual act of distribution.

Id. at 302 (emphasis in original).

 In the present case, unlike Hernandez, there is independent evidence of Berkowitz' prior possession of the kilogram of cocaine [16] before the actual time of distribution. As in Foundas, the transportation of the drugs by the appellant to the place of distribution constituted "possession . . . separate from the actual act of distribution." Id. The evidence sufficiently established that Berkowitz had constructive possession of the cocaine during the car ride to the Hidden Harbor Condominium, if not actual

---

14. Prior to the actual distribution, Hernandez and his confederate left the restaurant where the negotiations had taken place and later returned with a one gram sample of the heroin for inspection by the "buyer" (i. e., the undercover agents). The en banc opinion, however, treats the subsequent delivery of the ounce by the confederate alone as the basis of Hernandez' convictions for distribution and possession: "The evidence of the sale was relied upon to prove both Hernandez' constructive possession of the heroin and his intention to distribute it. There was no evidence of Pete's [Hernandez] possession of a controlled substance with intent to distribute it apart from the evidence of the actual sale." 591 F.2d at 1022. This view of the convictions in Hernandez is reinforced by the court's opinion in United States v. Foundas, 610 F.2d 298 (5th Cir. 1980), also written by Judge Rubin, the author of Hernandez: "In Hernandez, the convictions were both based on the same act: Hernandez' friend sold heroin to DEA agents. Hernandez was convicted separately for possession with intent to distribute and distribution (even though the only evidence of possession was his constructive possession at the time of distribution)." Id. at 302 (emphasis in original).

15. The indictment did not allege and the courts made no findings of any conspiracy in Hernandez, so the Pinkerton rule was not applicable in that case.

16. The larger quantities of drugs involved in Foundas and this case also provide stronger independent evidence of intent to distribute than was the case in Hernandez. Cf. United States v. Hernandez, 591 F.2d at 1022 (The evidence of the sale, and not the quantity of drugs, was relied upon to prove intent to distribute).

possession of the cocaine in his home.[17] We find that the facts of this case are controlled by *Foundas* and distinguishable from *Hernandez.* Therefore, Berkowitz could be properly sentenced for both possession with intent to distribute and distribution.[18]

### VII. CONCLUSION.

We conclude, having found no error in the proceedings below, that the judgment of the district court is

AFFIRMED.

---

17. Berkowitz urges that we distinguish his case from *Foundas* because in *Foundas* there was actual possession, whereas Berkowitz is charged only with constructive possession of the drugs. We find that this is a difference without distinction. Berkowitz has cited no case for this proposition and we are aware of no authority that would support such a distinction.

18. Berkowitz in his brief also challenged as improper under *Bifulco v. United States*, 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980),

imposing a special parole term as part of the sentence for conspiracy to distribute cocaine. Before oral argument, however, the district court *sua sponte* vacated this portion of the sentence, citing *Bifulco.* Berkowitz, in fact, did not argue this point at oral argument. The district court's action has rendered Berkowitz' special parole claim moot.

\* Former Fifth Circuit case, Section 9(1) of Public Law 96- 452—October 14, 1980.