[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-11288
_____

D.C. Docket No. 6:11-cr-00049-JA-DAB-3

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ALEXANDR POSTICA,
a.k.a. Aleksandr,
a.k.a. Sasha,
a.k.a. Kumatru,
ALEKSANDRA LIUBINA,
a.k.a. Sasha,
a.k.a. Tess,
NATALIA FEDOROVA,
a.k.a. Katie,
a.k.a. Sonya,
a.k.a. Natasha,
ALINA PRIADKO,
a.k.a. Sophia,
SAIDA BABAEVA,
a.k.a. Sasha,
a.k.a. Tess,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(December 31, 2013)

Before CARNES, Chief Judge, HULL and GARZA,[*] Circuit Judges.

PER CURIAM:

The defendants in this case participated in a multi-state prostitution enterprise involving spas where the masseuses offered to provide clients with "happy endings" in exchange for cash.  The scheme, however, did not end happily for the five defendants who brought this appeal.  A jury ultimately convicted all five of them — Alexandr Postica, Aleksandra Liubina, Natalia Federova, Alina Priadko, and Saida Babaeva — of aiding and abetting a violation of the Travel Act, 18 U.S.C. § 1952(a), and of conspiring to violate the Travel Act.  Postica was also convicted of conspiring to violate three additional statutes:  8 U.S.C. § 1328, 8 U.S.C. § 1324a(a)(1)(A), (a)(2), and 18 U.S.C. § 2421.  The other four defendants in this appeal were not charged with conspiring to violate those three other statutes. The district court sentenced Postica to concurrent terms of 15 months imprisonment while the other four defendants were sentenced to time served.  They

_____

[*] Honorable Emilio M. Garza, United States Circuit Judge for the Fifth Circuit Court of Appeals, sitting by designation.

2

now appeal their convictions on various grounds. The defendants challenge their convictions, not their sentences.

## I.

Roman Caraiman was the leader of a multi-state prostitution scheme involving spas in Orlando, Tampa, Atlanta, Cincinnati, Detroit, and Boston. At those spas, female masseuses gave male customers massages and offered to masturbate them for an additional charge, usually $40.00 or $50.00. Caraiman advertised his spas over the Internet, and those ads provided a central telephone number that prospective clients could call to set up appointments at the various spas.

In June 2010 Caraiman opened his Tampa spa, intending to staff that location with women who had worked for him before. Two of those women, Federova and Liubina, flew from Moscow to Miami on June 19, 2010. Caraiman picked them up at the airport and drove them to Tampa. As part of an investigation that began in July 2010, undercover detectives set up appointments for massages at the Tampa spa. Those undercover detectives received massages from Federova and Liubina, and both women offered to masturbate the detectives for an additional $50.00.[1]

---

[1] The prices were not, however, firm. When the detective told Liubina that he only had $30.00 she offered to do it for that amount.

In October 2010 Federova and Liubina travelled from Tampa to Boston, where they began working at another spa owned by Caraiman.  As in the Tampa investigation, undercover officers investigating Caraiman's Boston spa got massages and received offers from masseuses to masturbate them for more money. Both Federova and Liubina spoke with Caraiman by cell phone while they were in Boston, keeping him apprised of how business was going at the Boston spa. Postica later took the two women to work at Caraiman's spa in Detroit.

In early November 2010, investigators conducting surveillance of Caraiman's Atlanta spa observed Priadko and Babaeva at that location.  The next month, however, the women were working at Caraiman's Cincinnati spa. Undercover officers investigating the Cincinnati spa received massages from Priadko and Babaeva on separate occasions, and during those massages the two women offered to masturbate the undercover officers for additional money.  At Caraiman's request Postica soon brought Babaeva from Cincinnati to Detroit so she could work at the Detroit spa.  Postica, who helped Caraiman recruit women to work at the various spas, was in charge of that Detroit spa.  He also helped Caraiman transport many of the female masseuses between the different spa locations as part of the multi-state scheme.

Caraiman's scheme did not last.  In February 2011 a federal grand jury returned an indictment charging him and eleven other codefendants with

4

conspiring to violate various federal laws, including the Travel Act.  Eight of the defendants were also charged with aiding and abetting substantive violations of the Travel Act.  Caraiman fled the United States before the authorities could arrest him, and he had not been captured at the time of this trial.  His eleven codefendants were arrested and pleaded not guilty to the charges against them.  A jury acquitted five of them, but the other six were convicted on the substantive aiding and abetting counts as well as the conspiracy count.  Five of those convicted defendants are the appellants now before us.[2]

## II.

Postica's only contention on appeal is that two restrictions the district court placed on his cross-examination of Agents Darrell McCaskill and Ryan Eggland violated his Sixth Amendment right to present a complete defense.

"Trial judges retain wide latitude to impose reasonable limits on cross-examination based on concerns about, among other things, confusion of the issues or interrogation that is repetitive or only marginally relevant."  United States v. Baptista-Rodriguez, 17 F.3d 1354, 1370–71 (11th Cir. 1994).  We review those restrictions only for an abuse of discretion, id., even when the defendant claims that the restrictions violated his Sixth Amendment rights.  See United States v. Lyons, 403 F.3d 1248, 1255–56 (11th Cir. 2005).

---

[2] Tatiana Belinschi, the sixth codefendant who was found guilty, did not appeal her convictions.

5

Cross-examination is a crucial element of a defendant's right to confront witnesses under the Sixth Amendment, and "[s]ignificant restrictions on cross-examination can eviscerate this right and compel reversal." United States v. Berkowitz, 662 F.2d 1127, 1138 (5th Cir. Unit B Dec. 1981).  However, the defendant's right to confront witnesses is not boundless. See id.  A defendant "is entitled only to an opportunity for effective cross-examination, not cross-examination that is effective" in whatever way he may wish. Baptista-Rodriguez, 17 F.3d at 1366.

## A.

During his cross-examination of Agent McCaskill, Postica sought to ask him whether he was aware of any statements made by certain codefendants that mentioned Postica while they were discussing illicit activity.  He planned to ask those questions only about codefendants whom he did not know, and for that reason anticipated they would respond "no" to each question.  His strategy was to use those answers to suggest to the jury that the government could not prove he knew of any ongoing conspiracy.  The government objected to Postica's line of questioning, arguing that it would mislead the jury because if any of the other codefendants had made statements to McCaskill implicating Postica, the Bruton decision would prevent the government from having McCaskill testify about them. See Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620 (1968). The jury could be

6

misled.  The district court ruled that it would not allow Postica to limit his questions in the way he wanted.  When questioning resumed, instead of asking whether Agent McCaskill was aware of certain statements made by certain codefendants, he asked if McCaskill knew whether Postica had discussed certain things, such as masturbating spa clients, with those codefendants.  McCaskill responded that he did not know whether Postica had discussed those topics with those codefendants.

The district court did not abuse its discretion by restricting Postica's cross-examination of McCaskill.  The questions that Postica was allowed to ask prevented any misleading implications while still permitting him to advance his defense theory that the government had not satisfied its burden of showing that Postica was a knowing and intentional participant in the conspiracy.  The restrictions the district court imposed did not prevent Postica from presenting a complete defense; he still had the opportunity to effectively cross-examine McCaskill.  See Kentucky v. Stincer, 482 U.S. 730, 739, 107 S.Ct. 2658, 2664 (1987) (noting that a defendant is not entitled to "cross-examination that is effective in whatever way, and to whatever extent, [he] might wish"); Baptista-Rodriguez, 17 F.3d at 1366.  District courts have broad authority to restrict cross-examination in order to avoid the risk that the jury will be misled or confused.  See Baptista-Rodriguez, 17 F.3d at 1370 (noting that district courts "retain wide

7

latitude to impose reasonable limits on cross-examination" based on a variety of concerns including "confusion of the issues").

## B.

During a brief recess in the middle of Postica's cross-examination of Agent Eggland, Postica told the court that he intended to go through each wiretap recording the government had discussed (about fifty), have Eggland take the time to review the transcript of it, and then ask him the same three questions about each transcript.  The district court recognized that would be an inefficient way to question Eggland that would waste time.  Because Postica expected to receive a "no" response to all of his proposed questions, the court reasoned that it would be more efficient for Postica to ask his three questions as to all the exhibits at once, instead of repeating the three questions for each exhibit over and over again. Using its authority under Federal Rule of Evidence 611, the court directed him to streamline his strategy.  At the district court's direction, Postica listed all of the exhibits he wanted to ask Eggland about, Eggland reviewed those transcripts while the trial was recessed, and then Postica asked his three questions of Eggland as to all of those transcripts at once.

The district court's ruling was not an abuse of discretion.  Requiring Postica to ask his three questions about the identified wiretaps all at once, instead of going through each of the fifty conversations and wiretaps one by one, allowed him to

establish the fact he wanted to put before the jury without wasting time. The court's reasonable exercise of control over the mode of questioning did not harm Postica and was entirely appropriate under Rule 611. See Fed. R. Evid. 611(a)(2) (noting that the "court should exercise reasonable control over the mode . . . of examining witnesses . . . so as to avoid wasting time").

### III.

Federova, Liubina, Priadko, and Babaeva were all convicted of aiding and abetting substantive violations of the Travel Act and conspiring to violate the Act. At the close of evidence, all four women moved under Federal Rule of Criminal Procedure 29 for judgments of acquittal. The district court denied those motions. They now challenge the court's decision, arguing that there was insufficient evidence to convict them on the aiding and abetting and conspiracy counts.

"We review de novo the sufficiency of the evidence presented at trial, and we will not disturb a guilty verdict unless, given the evidence in the record, no trier of fact could have found guilt beyond a reasonable doubt." United States v. White, 663 F.3d 1207, 1213 (11th Cir. 2011) (quotation marks omitted); see also United States v. Castro, 89 F.3d 1443, 1450 (11th Cir. 1996). "In reviewing the sufficiency of the evidence, we look at the record in the light most favorable to the verdict and draw all reasonable inferences and resolve all questions of credibility in its favor." White, 663 F.3d at 1213 (quotation marks omitted).

9

To prove guilt under the aiding and abetting counts the government had to prove that: (1) at least one of the defendants violated the Travel Act, (2) Federova, Liubina, Priadko, and Babaeva committed an act that contributed to or furthered the Travel Act violation, and (3) they intended to aid the violation.  See United States v. Camacho, 233 F.3d 1308, 1317 (11th Cir. 2000).  To convict Federova, Liubina, Priadko, and Babaeva on the conspiracy count, the government had to prove that (1) there was an agreement between each of them and at least one other person to violate the Travel Act, (2) they knowingly and voluntarily participated in that agreement, and (3) one of the conspirators committed an overt act in furtherance of the agreement.  See United States v. Hasson, 333 F.3d 1264, 1270 (11th Cir. 2003).  The government is not limited at trial to proving the conspiracy solely through the overt acts pleaded in the indictment.  See United States v. Perez, 489 F.2d 51, 70 (5th Cir. 1973).[3]  Instead, it may prove the conspiracy by showing other acts of the conspirators that occurred during the conspiracy.  See United States v. Ayres, 434 F.2d 60, 62 (5th Cir. 1970).

To establish a Travel Act violation, the government had to show that (1) a defendant traveled or used a facility in interstate or foreign commerce, (2) with the intent to promote, manage, establish, carry on, or facilitate unlawful activity, and

---

[3] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

(3) thereafter actually attempted to or did in fact promote, manage, establish, carry on, or facilitate the unlawful activity.  18 U.S.C. § 1952(a); see also United States v. James, 210 F.3d 1342, 1345 (11th Cir. 2000).  "Unlawful activity" under the Travel Act includes "any business enterprise involving . . . prostitution offenses in violation of the laws of the State in which they are committed or of the United States."  18 U.S.C. § 1952(b)(1).  The government must show "a continuous course of conduct to establish that a 'business enterprise' was involved."  James, 210 F.3d at 1345.

The government presented sufficient evidence to convict Federova, Liubina, Priadko, and Babaeva on the aiding and abetting counts.  There was abundant evidence that, at the very least, Caraiman engaged in a continuous course of conduct by traveling and using facilities in interstate and foreign commerce with the intent to manage and carry on a business enterprise involving prostitution.  Reasonable jurors would have no trouble finding beyond a reasonable doubt that Caraiman violated the Travel Act.  See 18 U.S.C. § 1952(a); White, 663 F.3d at 1213.

The government also presented sufficient evidence for a reasonable juror to conclude that Federova, Liubina, Priadko, and Babaeva committed an act that contributed to or furthered Caraiman's Travel Act violation.  Several detectives testified at trial that all four women offered to masturbate them in exchange for

11

money when the detectives went in for massages at Caraiman's spas.  In addition, the government played wiretaps for the jury that showed several of the women discussing business matters at the spas with Caraiman.  That evidence was sufficient to establish that all four women committed at least one act to further Caraiman's Travel Act violation.  A reasonable juror also could have inferred that based on their conduct the four intended to aid Caraiman.  See United States v. Gooding, 473 F.2d 425, 428 (5th Cir. 1973) ("It is well established that intent, an element of the offense, may be inferred from objective facts, such as defendant's conduct immediately before and after travel."); see also United States v. Maxwell, 579 F.3d 1282, 1301 (11th Cir. 2009); Lancaster v. Newsome, 880 F.2d 362, 370 (11th Cir. 1989) ("It should be emphasized that juries are free to infer intent from conduct.").  For these reasons, we conclude that the government presented sufficient evidence to convict Federova, Liubina, Priadko, and Babaeva of aiding and abetting a Travel Act violation, and the district court did not err in denying their Rule 29 motions on those counts.

We similarly conclude that there was sufficient evidence to convict those four defendants of conspiring to violate the Travel Act.  The evidence at trial showed that Federova, Liubina, Priadko, and Babaeva all engaged in similar conduct by offering to masturbate clients for money and traveling across state lines to work at several of Caraiman's spas.  Evidence of their participation in virtually

12

the same illegal conduct was sufficient to allow a reasonable juror to infer that there was an agreement among the defendants to engage in conduct that violated the Travel Act and that Federova, Liubina, Priadko, and Babaeva knowingly and voluntarily participated in that agreement. See, e.g., United States v. Seher, 562 F.3d 1344, 1364 (11th Cir. 2009) ("The government can show the existence of [a conspiracy] via circumstantial evidence, which would include making inferences based on the conduct of those allegedly involved in the scheme."); United States v. Macko, 994 F.2d 1526, 1533 (11th Cir. 1993) ("Circumstantial evidence may prove knowledge and intent."); United States v. Slone, 601 F.2d 800, 803 (5th Cir. 1979) ("[T]he necessary guilty knowledge, often difficult to prove through direct evidence, may be inferred from other circumstantial evidence.") (quotation marks omitted). Finally, evidence that all four women offered to masturbate clients for money was sufficient for a jury to conclude that the women committed overt acts to further the conspiracy. For these reasons, the evidence was sufficient to convict Federova, Liubina, Priadko, and Babaeva of conspiring to violate the Travel Act.[4]

---

[4] As part of her sufficiency challenge, Liubina also argues that the government proved at best several separate conspiracies, instead of the single larger conspiracy charged in the indictment. She claims that this material variance requires reversal of her conviction. To determine whether a variance occurred, we view the evidence in the light most favorable to the government and ask whether a reasonable juror could have found the existence of a single conspiracy beyond a reasonable doubt. United States v. Coy, 19 F.3d 629, 633 (11th Cir. 1994). A single conspiracy may exist even if a particular co-conspirator did not participate in every stage of the conspiracy. United States v. Moore, 525 F.3d 1033, 1042 (11th Cir. 2008). What matters is that the co-conspirator's actions "facilitated the endeavors of other co-conspirators, or facilitated the venture as a whole." Id. (emphasis in original). The evidence at trial showed that

IV.

In its jury instructions, the district court provided the jury with a general definition of prostitution under the law of all the states where Caraiman operated spas. Federova now contends that the district court erred by providing that general definition instead of Florida's specific definition of prostitution, as expressed in Florida Standard Criminal Jury Instruction 23.5. She did not ask the district court to provide the jury with that specific instruction at trial, and she did not object to the instructions that the court did give the jury. Therefore, we review her argument only for plain error. See United States v. Gibson, 708 F.3d 1256, 1275 (11th Cir. 2013); United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005). Under that standard, Federova has the burden of showing that (1) an error occurred, (2) the error was plain, and (3) it affected her substantial rights. United States v. Felts, 579 F.3d 1341, 1344 (11th Cir. 2009).

Federova's argument fails because she cannot meet the second or third requirements of the plain error standard. First, she cannot show any error that was plain. "In order to be plain enough for the plain error rule, an asserted error must be clear from the plain meaning of a statute or constitutional provision, or from a

---

Caraiman was the key man in the conspiracy, operating spas in five states and employing Liubina and others to work in several of them. Based on that evidence, a reasonable juror could have found that a single conspiracy existed beyond a reasonable doubt. See United States v. Edouard, 485 F.3d 1324, 1347 (11th Cir. 2007) ("[T]he finding of a single conspiracy is permitted where a 'key man' directs and coordinates the activities and individual efforts of various combinations of people.").

14

holding of the Supreme Court or this Court." Rodriguez, 398 F.3d at 1298. Our predecessor court specifically rejected the contention that the district court erred by not providing the jury with the state law definition of arson, which was the relevant unlawful activity (like prostitution here) underlying the Travel Act violation in that case. United States v. Conway, 507 F.2d 1047, 1051–52 (5th Cir. 1975) ("'Arson' is a commonly used and understood word. There was sufficient evidence upon which the jury could find that the appellant traveled in interstate commerce with intent to bomb and/or burn a Maryland building. There is no requirement that the jury be instructed on the Maryland definition of arson and there is no reversible error here."). We are bound by Conway's holding. In light of it, the district court did not commit any error, much less plain error, by instructing the jury as it did on the definition of prostitution.

Nor has Federova carried her burden of proving that the district court's instruction affected her substantial rights. To establish that the district court's failure to instruct the jury on Florida's definition of prostitution affected her substantial rights, Federova must show that the omission affected the outcome of her case. Rodriguez, 398 F.3d at 1299. In other words, she must show a "reasonable probability of a different result" but for the district court's failure to give the jury that instruction. Id. "This burden of showing prejudice to meet the third-prong requirement is anything but easy." Id.

15

Because Caraiman's business enterprise operated in several states and Federova was charged with aiding and abetting and conspiring to operate that larger enterprise, the outcome here would have been different only if her actions and those of her codefendants did not qualify as prostitution in any of the states where Caraiman ran spas. See 18 U.S.C. § 1952(b) (providing that "'unlawful activity' means (1) any business enterprise involving . . . prostitution offenses in violation of the laws of the State in which they are committed or of the United States"). Federova does not argue that giving the jury Florida's definition of prostitution would have led it to conclude that the acts occurring in Michigan, Ohio, Massachusetts, and Georgia did not qualify as prostitution under the laws of those states. Therefore, she has not carried her burden of establishing that she would have been acquitted, but for the omission from the jury instructions.[5]

**AFFIRMED.**[6]

---

[5] Federova also complains that the court's jury instructions were confusing and allowed the jury to convict her based on conduct not charged in the indictment. After reviewing the court's jury instructions, we conclude that Federova's argument is meritless.

[6] This appeal was originally scheduled for oral argument but was removed from the oral argument calendar by unanimous agreement of the panel under 11th Cir. R. 34-3(f).

16