41813, 41815. JOHNSON v. THE STATE (two cases).
41814. SMITH v. THE STATE.
(331 SE2d 578)

BELL, Justice.

William "Bill" Augustos Johnson, Holly Dawn Johnson, a/k/a Weiss, a/k/a Henderson, and Donnie James Smith were jointly indicted for various offenses connected with the death of James "Jim" Edward Henderson, who was Holly's former husband (they divorced in 1980) and the consanguineous uncle of Donnie. In Count 1 of the indictment they were charged with aggravated assault; in Count 2 with kidnapping; in Count 3, with malice murder; and Count 4, with concealing the death of another. They were jointly tried, and were convicted of certain offenses. Each appeals.[1] For convenience we will

---

[1] Henderson was killed on September 20, 1983. A Fulton County grand jury returned the indictment December 20, 1983. The trial commenced January 23, 1984, and ended with a jury verdict on February 3.

William Johnson was convicted of all counts as charged. On February 9, 1984, he was sentenced to life imprisonment for the murder. He was further sentenced to serve twenty years for the aggravated assault, twenty years for the kidnapping, and twelve months for concealing the death of his victim. Johnson filed a motion for new trial on March 2, 1984, which was denied by an order entered October 2, 1984. Johnson filed his notice of appeal October 25.

Donnie Smith was convicted of assault, false imprisonment, felony murder, and concealing the death of another. On February 9, 1984, he was sentenced to serve twelve months for the assault, ten years for false imprisonment, life for murder, and 12 months for concealing the death of another. On March 2 he moved for a new trial, which was denied October 2,

summarize the facts of this case, then separately discuss each appellant's enumerations.

In June 1983 Holly and Bill were living in Illinois. Holly was employed in a dog grooming business owned by Catherine Pollard. Pollard lived in an apartment, to which there were two keys. Pollard had one, and Holly had the other. Pollard testified that she kept a 9mm pistol in her bedroom. On June 19, 1983, she discovered the gun was missing, although there was no sign of forced entry to the apartment.

According to William Johnson, he and Holly decided to move from Illinois to Atlanta in response to repeated business offers from Jim Henderson. Bill testified that Henderson told them that if they worked 30 days for the family business, Carpet Cleaners of Georgia, he would let them have their own franchise. On June 20, 1983, Holly and Bill wed. They drove to Florida for a honeymoon, with the 9mm pistol hidden in the trunk of Holly's Volkswagen. While in Florida the couple argued, and Holly left the state without Bill. She drove to Atlanta, then returned to Florida with Donnie and Jim in an unsuccessful attempt to find Bill. Henderson, who had found the 9mm pistol in Holly's car, left the party and returned to Georgia, sending the gun ahead by bus. Bill eventually made his separate way to Atlanta.

The capital for Carpet Cleaners of Georgia was provided by Henderson's mother, Margaret Henderson, and the business was owned by Robert Mairs, Donnie's stepfather. Henderson's nephews, brothers Ronnie and appellant Donnie Smith, were also intermittently employed in the business. Henderson apparently did not get along well with Donnie, Bill, or Holly. Umeko Sugimura Glass, Henderson's fiancée, testified that Henderson told her he had problems working with his nephews. Another witness, Rodney Emlet, said that Donnie came to Emlet's house about three weeks before the killing. Donnie, according to Emlet, was very upset, and told him that Henderson had just run him out of a house with a weapon. Donnie also told Emlet that he was going to kill Henderson.

Ronnie Smith testified that sometime after Holly came to Atlanta, she told him that Ronnie ought to kill Henderson and take his body to Florida, and then help her run the carpet business.

---

1984. He filed his notice of appeal October 30.

Holly Johnson was convicted of aggravated assault, kidnapping, felony murder, and concealing the death of another. On February 9 she was sentenced to serve twenty years for the aggravated assault, twenty years for kidnapping, life for murder, and twelve months for concealing the death of Henderson. On March 9 she moved for a new trial, which was denied October 2. She filed her notice of appeal October 30, 1984.

The court reporter completed certifying the transcript on June 25, 1984. The clerk of the court certified the record in early December, and the appeals were docketed in this court December 17, 1984. On February 1, 1985, Smith and Holly Johnson submitted their appeals for decision on briefs. We heard oral arguments as to William Johnson's appeal on February 5, 1985.

Bill, Holly, and Donnie's grievances eventually focused on two points of dispute. One was that Jim had given Umeko one of Holly's diamond rings, and Holly wanted it back. The second was that, according to appellants, Jim had retained possession of the 9mm pistol, and was blackmailing Holly and Bill by threatening to report its theft and send Holly (who had a criminal record) back to prison.

The deceased spent the night of September 19-20, 1983, at Umeko Glass' house. She testified that early the next morning Bill came to the house, and drove away with Jim in Jim's Mustang. Although Glass did not observe him, Donnie had accompanied Bill to her house. The three men drove to Holly and Bill's apartment, which Carpet Cleaners was paying for as a company perquisite. After they arrived, Jim was tied, severely beaten, and menaced with a .22 caliber rifle in an effort to force him to agree to return the ring and disclose the location of the gun. He told the appellants that the gun was buried at the Mairs residence. According to Donnie, he checked the house three times, but could not find the gun. Finally, the three appellants drove Jim to the house and searched for the gun, but with no success. According to Donnie, he and Bill put Jim in the back of the Mustang and drove around for a time, with Donnie driving and Bill sitting in the front passenger seat, trying to coerce Henderson into revealing the information they sought. Donnie said that Bill fired the .22 rifle through the window of the Mustang to frighten Jim, leaving a hole in the window, then fired the gun past Jim in the direction of the trunk, creating a dent in the car's sheetmetal. He finally shot Jim twice in the head. According to Donnie, the two men dumped the body in some woods and returned to the Riverdale Road apartment. He and Bill returned and attempted to bury the body, but found the task too difficult and gave up the attempt. Holly and Bill then left town in Holly's Volkswagen.

After Holly and Bill left, Donnie used the Mustang to retrieve Jim's body, placing it in the trunk. Later, he broke out the left side rear window of the Mustang because he did not want anyone to see the bullet hole, and hammered out the dent from the ricocheting bullet. He made arrangements through his attorney to surrender to the police, and on the evening of September 22-23, 1983, turned over the Mustang and the body to Fulton County police. Holly and Bill were subsequently apprehended in Hernando, Mississippi. A bloodstained washrag was discovered on the floor of their vehicle. According to police, Bill volunteered that the stain had been deposited when Holly used the rag to clean up blood from her menstrual period.

Dr. Saleh Zaki, chief medical examiner for Fulton County, performed the autopsy. He testified that the body exhibited multiple bruises and abrasions resulting from blunt trauma. The cause of death was two contact or near-contact bullet wounds to the face, ei-

ther of which would have been fatal. Dr. Zaki opined that the bullets had traveled through the head from front to back, at a slight upward inclination.

Dr. Kelly Fite, chief firearms examiner with the Division of Forensic Sciences (formerly the State Crime Lab), testified that a mutilated lead fragment recovered from Henderson's head was a portion of a .22 caliber bullet, and that other lead fragments recovered from his head were consistent with .22 caliber bullets. A mutilated lead bullet had been recovered from the Mustang's trunk, and Fite and Robert Clemensen, a microanalyst with the Division of Forensic Sciences, testified that tests on the car produced results consistent with the shot being fired from the inside right front of the car to the left rear, and ricocheting into the trunk. Forensic serologists from the Division of Forensic Services testified that bloodstains recovered from the Mustang and the washrag found in Holly's Volkswagen were consistent with the victim's blood. The bloodstain on the washrag was inconsistent with Holly's blood.

Joanne Stoner of the Israel Pawn Shop, in Atlanta, testified that on the morning of September 21, 1983, Bill and Holly were her first customers. They pawned a color TV and carpet cleaning equipment, for which they received $200.

After their arrests all three defendants gave statements to the police which were introduced against them at trial. In addition, all three testified in their own defense. In essence, Donnie tried to place the blame for the murder on Bill and Holly, claiming that his participation in the events surrounding the killing was coerced. He claimed that, although he had known when he and Bill picked up Jim that Holly and Bill were going to attempt to force Jim to return the ring and gun, they had told him Jim would not be harmed, and he did not know otherwise until Bill and Holly began to beat Jim at the apartment. He admitted he helped to subdue and tie up Jim at the apartment, but claimed he did it to help the victim avoid an even more severe beating from Bill and Holly. He asserted that he went along with the murder because he was afraid Bill would kill him if he did not, and for the same reason delayed reporting Jim's death to the police.

Bill swore that Donnie was responsible for Jim's death — he said he last saw Jim alive driving away from the apartment in his car with Donnie. He claimed that Jim had given him the carpet cleaning equipment. Holly admitted having been present when Jim was beaten and tied, but denied having participated in the beating or conspired to kill him.

## 41813. William Johnson

1. William Johnson does not raise the general grounds. However, we nevertheless have reviewed the record, and we find that the evidence was sufficient for a rational trier of fact to have found him guilty beyond a reasonable doubt of the offenses of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Johnson raises a single enumeration of error, which concerns the testimony of Frank Magbanua. Magbanua had been Donnie's cellmate in the Fulton County jail. At trial Bill called Magbanua as a witness. He testified that Donnie had talked with him and admitted the murder of Henderson, but had said he "was gonna place the blame on some dude down the hall," presumably Bill Johnson. He also told Magbanua that "he was going to play crazy." On cross-examination Magbanua admitted that he was currently in prison on a bank robbery conviction. The district attorney questioned him about portions of two psychiatric reports on his mental condition, and subsequently introduced the reports into evidence. In his enumeration Bill Johnson contends that these reports were privileged, and that the court erred by allowing their use during cross-examination and admitting them into evidence. We find no error.

"The personal privilege of a witness can not be set up by a party to the cause on trial, as a ground for excluding testimony which the witness gives without claiming the protection of his privilege." *McCray v. State*, 134 Ga. 416 (8) (68 SE 62) (1910). See Green, Ga. Law of Evidence (2nd ed.), § 153. Appellant has no standing to raise this issue on appeal.[2]

For the above reasons, the convictions and sentences of William Augustos Johnson are affirmed.

## 41814. Donnie Smith

3. Like co-appellant Bill Johnson, Smith has not raised the general grounds, but we have reviewed the record and find the evidence was sufficient for a rational trier of fact to have found him guilty beyond a reasonable doubt of the offenses of which he was convicted. *Jackson v. Virginia*, supra, 443 U. S.

4. Smith brings twelve enumerations of error for our review.[3] In his first enumeration, he contends that the court erred in refusing to vacate his conviction of false imprisonment. This enumeration has

---

[2] We note that Magbanua did not attempt to invoke the psychiatrist-patient privilege.

[3] He originally filed thirteen, but subsequently withdrew his sixth, which alleged ineffective assistance of trial counsel (who is also appellate counsel).

merit. The felony offenses of aggravated assault, kidnapping, and false imprisonment were charged to the jury.[4] The court also instructed on felony murder, and on the three offenses of aggravated assault, kidnapping, and false imprisonment as the possible underlying felony. In addition to felony murder, Donnie was convicted of two misdemeanors: simple assault (a lesser included offense of aggravated assault) and concealing the death; and one felony: false imprisonment. Smith asserts, and the state concedes, that his false imprisonment conviction was the underlying felony for his conviction of felony murder, and therefore merged into the felony murder conviction. We agree, and vacate the conviction and sentence for false imprisonment. *Blankenship v. State*, 247 Ga. 590 (2) (277 SE2d 505) (1981).

5. In his second enumeration, Donnie contends that the trial court erroneously gave the jurors ex parte supplemental instructions during their deliberations. As the court stated for the record at the sentencing hearing, all parties had consented to the trial judge entering the jury room to inquire of the jurors whether they wished to recess their deliberations for the evening. The judge, accompanied by a bailiff, entered the jury room. Then, in the court's own words, the following ensued: "They asked if they could ask me a question and I responded no, that they couldn't, that if they needed to ask a question we would have to assemble everybody and ask the question formally on the record. They then proceeded to ask the question anyway, which was, 'Did we get a charge on felony murder?' And I responded, 'Yes, you did get a charge on felony murder.' Then they started talking about what it was and I said, 'I cannot answer that. If you wish to have a recharge on felony murder we can assemble everybody and I will recharge you on felony murder that I charged you before.' And they said yes, they would like that.

"And you will recall I informed everybody of that and we started assembling the Defendants to bring the jury back and then they rang the buzzer and said they didn't need it, that one of the jurors had found it in their notes, notes on that charge and they said that they didn't want the charge on felony murder.

"And then ten minutes later they came back and rendered their verdict. There was not an additional charge of felony murder given although they requested it at one point and I said I would give it and then they changed their mind and said they didn't."

The trial judge's conversation with the jurors clearly exceeded the scope of appellant's consent to enter the jury room. However, despite having been fully informed of the incident, Smith's counsel did

---

[4] The charge on false imprisonment was requested by co-appellant Holly Johnson, and concurred in by the prosecutor. Appellant Smith made no objection to it.

not contemporaneously object or request curative instructions. Therefore, we find that Smith waived the right to raise this issue on appeal. See also *Williams v. State*, 251 Ga. 749, 797 (11) (312 SE2d 40) (1983) (defendant waived presence during court's communication with jury, and court's statements to jury, although possibly exceeding the purpose of the communication, were not so prejudicial as to deny a fair trial). Cf. *McMichael v. State*, 252 Ga. 305 (4) (313 SE2d 693) (1984) (error for sheriff, who was state's witness, to enter jury room during deliberations to deliver indictment).

6. In his third enumeration, Donnie contends that the court should have granted his motion to sever his trial from his co-defendants'. We disagree. Based on our review of the record, we find that appellant has not carried his burden to make a clear showing of prejudice, and find no abuse of discretion. *Mulkey v. State*, 250 Ga. 444 (1) (298 SE2d 487) (1983).

7. Appellant's fourth enumeration concerns his attempt to exclude certain evidence of the circumstances of his arrest. He was hospitalized at the Psychiatric Institute of Atlanta from September 28 to October 6, 1983, and on October 11, 1983, was arrested at the eighth floor ward of Grady Hospital. At the beginning of trial Smith moved in limine to prevent any reference to his psychiatric hospitalization. The court ruled that the facts of Smith's hospitalization and the dates thereof were admissible. Smith appeals this ruling, raising two main contentions. First, he argues that the reference to psychiatric hospitalization impermissibly placed his character in issue and inflamed the jury. We disagree. It was a circumstance leading up to and surrounding his arrest, and the fact that reference to it may have incidentally placed Smith's character in issue did not affect its admissibility. *Lenear v. State*, 239 Ga. 617 (3,4) (238 SE2d 407) (1977).

Second, Smith contends that informing the jury of the fact of his hospitalization violated the psychiatrist-patient privilege afforded by OCGA § 24-9-21 (5). Again, we disagree. Here, the facts that the two hospitals treated him as a patient and the dates thereof are not within the psychiatrist-patient privilege. See *Cranford v. Cranford*, 120 Ga. App. 470 (2) (170 SE2d 844) (1969); 97 CJS 835, Witnesses, § 295 (c) (1957 ed.) Moreover, appellant has not shown that the information made known to the state by the hospitals and used at trial originated as communications from appellant to an attending psychiatrist or his agent. *Myers v. State*, 251 Ga. 883 (2) (310 SE2d 504) (1984); *Weksler v. Weksler*, 173 Ga. App. 250 (325 SE2d 874) (1985).

8. During his closing argument to the jury, appellant's counsel requested the court to reopen the evidence, in order to allow him to introduce a certified copy of a pre-trial hearing transcript which contained testimony of a witness for the state, Detective Murry. Smith argues that Murry's pre-trial testimony would have contradicted

Murry's trial testimony concerning his investigation of the case, and that the court thus erred by refusing to reopen. We find no error.

A "trial court has a sound discretion to determine whether the evidence in a case may be reopened." *Mooneyham v. State*, 251 Ga. 404 (2) (306 SE2d 272) (1983); *Castell v. State*, 250 Ga. 776, 790 (9) (301 SE2d 234) (1983); *Scott v. State*, 166 Ga. App. 240 (304 SE2d 89) (1983). Defense counsel repeatedly referred to the pre-trial hearing transcript during his cross-examination of Murry, and therefore cannot claim that the transcript is newly discovered evidence. As counsel himself concedes, "The error on this point was indeed caused by the failure of the appellant's trial attorney to tender the transcript as a defense exhibit into evidence." As we held in *Castell*, supra at 791, "[a] trial must come to an end at some point, and we find no abuse of discretion in this case."

9. Enumeration Seven contains Smith's contention that he could not be convicted for felony murder because the underlying felony had been terminated. In essence he contends that his participation in the false imprisonment ceased after he, Henderson, and his co-defendants left Holly and Bill's apartment. After that event, he argues, he too was a prisoner, and the subsequent murder thus fell outside the res gestae of the underlying felony. We disagree. "Generally, whether a felony is terminated is a question of fact for the jury unless the evidence is so overwhelming that reasonable men could not differ." *Collier v. State*, 244 Ga. 553, 562 (3) (261 SE2d 364) (1979). There was sufficient evidence for the jury to find that appellant had not ceased his participation in holding Henderson against his will, and the verdict of felony murder was therefore authorized.

10. During the trial three statements by Donnie, two written and one oral, were admitted into evidence. In Enumeration Eight Smith complains that his oral statement and his second written statement were obtained in violation of his *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966) rights, and therefore were erroneously admitted. We find no error.

"Unless clearly erroneous, a trial court's findings as to factual determinations and credibility relating to the admissibility of a confession will be upheld on appeal." *Berry v. State*, 254 Ga. 101, 104 (1) (326 SE2d 748) (1985). Appellant's written argument in support of this enumeration refers us almost exclusively to transcripts of pretrial hearings which are not in the record. The burden is upon appellant to ensure that his enumerations are supported by the record. Because he has not fulfilled his duty to see that the necessary portions of the record were transmitted to this court, we treat this enumeration as abandoned. Moreover, from our review of evidence submitted at trial, we find that the court did not err by admitting the two statements in question.

11. During appellant's counsel's cross-examination of a state's witness, the court rebuked counsel for improperly commenting upon the conduct of the district attorney during direct examination of the witness. In Enumeration Nine, appellant contends that the rebuke constituted an expression of opinion as to his guilt or innocence. However, "[i]n doing these things, the trial judge was acting within his inherent power to supervise the course of the trial, and the trial judge did not express or intimate an opinion to the jury in violation of [OCGA § 17-8-55]." *Moret v. State,* 246 Ga. 5 (2) (268 SE2d 635) (1980).

12. In his tenth enumeration appellant argues five separate violations of *Brady v. Maryland,* 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963). We have reviewed each of his contentions, and find no error. Appellant's first two contentions are that the prosecution violated his right to a fair trial by withholding written investigatory statements by witnesses Rodney Emlet and Thomas Davis. We disagree.

The controversy centers around whether appellant told the witnesses that he had shot Henderson, and whether the witnesses repeated this alleged admission to Detective Murry. At trial, appellant's counsel questioned each witness on this issue. Each averred that Donnie told him he did not shoot Henderson, and denied having told Detective Murry otherwise. Appellant's counsel also questioned Det. Murry, focusing on testimony which Murry had given during an October 15, 1983, preliminary hearing.[5] Det. Murry admitted having testified that several people, including Davis, had told him that Donnie told them he shot Henderson.

On appeal, Smith contends that the court erred by refusing to direct the state to furnish him with copies of Emlet's and Davis' pre-trial statements, in which they had stated that Donnie told them that someone else had shot Henderson. We find no error. *Brady* does not require pre-trial disclosure of material, and Smith has the burden to show prejudice to his case resulting from the prosecution's refusal to turn over Emlet's and Davis' statements. Smith was ultimately apprised of the substance of the relevant part of the witnesses' statements. Moreover, he availed himself of the opportunity to fully cross-examine Det. Murry, and to seek to impeach him with his allegedly contradictory earlier testimony. Inasmuch as he has not shown how earlier disclosure would have benefitted the defense, or that the delayed disclosure deprived him of a fair trial, we affirm. *Burney v. State,* 252 Ga. 25 (3) (310 SE2d 899) (1984). Furthermore, we find that Smith did not object at trial to the failure to disclose Davis'

---

[5] The transcript of the October 15, 1983, hearing was not introduced into evidence, nor has it been transmitted as part of the record.

statement, and therefore has waived the *Brady* issue as to that statement.

13. Another of Smith's *Brady* contentions is that the state suppressed an exculpatory oral statement by Holly Johnson. The record shows that well into the trial the district attorney notified the court that Det. Murry had made known to him that he (Murry) had recalled a pre-trial oral statement by Holly Johnson. According to the proffer by the district attorney, Holly had told investigators that she feared her husband (co-appellant Bill Johnson), and wanted police protection for her family in Illinois. The prosecution sought to introduce this statement as newly discovered evidence unintentionally omitted from the police report, OCGA § 17-7-210 (e), but the court excluded it on the ground that, although there was no evidence of bad faith on the part of Murry or the district attorney, introduction of the statement would have unfairly surprised the defendants.

We find no *Brady* violation. Appellant Smith's argument, as we understand it, is that the fact that Holly had expressed a strong fear of Bill inferentially bolstered the credibility of Smith's own claim that he assisted his co-defendants because he feared Bill. Assuming without deciding that the strength of this inference is sufficient to present a *Brady* question (in our opinion it is tenuous at best), we find that Smith was not denied a fair trial by its omission from materials afforded to him prior to trial, inasmuch as Holly Johnson subsequently testified, giving Smith's counsel the opportunity to question her about her alleged fear of Bill Johnson. In light of his apparent election to forebear from that line of questioning, we hold that Smith has not borne his burden to show prejudice resulting from the failure to disclose the statement.

14. Smith contends that the district attorney violated *Brady* by withholding a scientific report on a fire which occurred at the Mairs residence. During direct examination, state's witness Nixon of the Fulton County Police Department testified that, during the investigation of Henderson's murder, he had learned of an attic fire in the Mairs residence. Suspecting that the fire may have been set in an attempt to destroy the 9mm pistol, he, along with Fulton County Fire Department personnel, had explored the attic and found the pistol. Nixon had not made any investigation as to whether the fire had been deliberately set, but the fire department had collected samples and sent them to the Division of Forensic Services. Nixon testified that he did not know the results of that investigation. After cross-examining Nixon, Smith's counsel moved for a mistrial. He stated that during a pre-trial hearing he had asked for the scientific report on the materials collected in the Mairs attic, but that he was denied the report after the district attorney had stated he did not intend to present evidence of the suspected arson. The court denied the motion for mis-

trial. Thereafter, the district attorney stipulated for the record that the investigation had uncovered no evidence of arson.

We find that this *Brady* contention is utterly without merit. First, in his brief appellant refers us to portions of a pre-trial hearing transcript which are not part of the record. Second, his objection at trial went solely to alleged prosecutorial misconduct,[6] not *Brady*. Third, since it is undisputed that the report expressed a conclusion that there was no arson, we do not perceive (and Smith has not attempted to argue) how that fact would exculpate appellant, who was not charged with arson. We therefore find no violation of Smith's right to a fair trial.

15. Smith's last *Brady* contention has to do with testimony by Umeko Glass. She testified that when Bill Johnson picked up Henderson at her house on the morning of September 20, 1983, she did not see anyone else accompanying him. After she testified, Smith's counsel moved for a directed verdict or mistrial, based on his speculation that the fact that she saw only Bill Johnson that morning may not have been in her pre-trial statements to investigators, an omission which appellant could have used to impeach Glass. However, our review of her statements, which were included in the *Brady* material forwarded to this court, shows that her statements were consistent with her testimony.

On appeal, counsel also contends that Glass' statement should have been disclosed because it would have contradicted Det. Murry's testimony concerning a written statement (the second of two) he had obtained from Donnie Smith. This contention was not urged in the superior court. Moreover, it is clear that Glass' statement that she had not observed a third party with Johnson is not contradictory of Smith's assertion that he had accompanied Bill Johnson, waited outside while Bill went into Glass' house to get Henderson, then driven away with the two men.

16. In his eleventh enumeration, Smith argues two distinct contentions. His initial argument is that the court erred by excluding testimony of a newspaper reporter, who would have testified that, at the end of Smith's preliminary hearing, the reporter observed Det. Murry tell Smith's counsel, "I think your client is going to be okay." The trial court excluded this statement as irrelevant. We agree, and affirm the ruling.

17. Smith also argues in Enumeration 11 that the court erroneously excluded the testimony of an assistant district attorney from

---

[6] There clearly was no misconduct on the part of the district attorney. Assuming he did indeed state during the pre-trial hearing that he would refrain from presenting evidence about the suspected arson, we do not interpret his line of questioning as a breach of that representation.

the Griffin Circuit, David Fowler. Fowler, according to Smith, would have testified that Smith's counsel had contacted him in an abortive effort to arrange to surrender Henderson's body to the Fayette County police. Smith contends that his counsel's conversations with Fowler were not hearsay, because they were admissible to explain Fowler's conduct.

We affirm the superior court's exclusion of Fowler's testimony. In *Momon v. State*, 249 Ga. 865 (294 SE2d 482) (1982), this court held that "where the conduct and motives of the actor are not matters concerning which the truth must be found (i.e., are irrelevant to the issues on trial) then the information, etc., on which he or she acted shall not be admissible . . ." Id. at 867. In this case, any earlier attempts by Smith to turn in the body arguably would have been relevant to the charge of concealing a death. However, the actor with whom we are concerned for the purpose of this enumeration is Fowler, and his conduct and motives were not relevant to prove or disprove Smith's criminal intent or any other issue in this case. Therefore, Fowler's repetition of Smith's counsel's statements would not have been admissible to explain Fowler's conduct.

18. In Enumeration 12 Smith argues that the court erred by failing to recharge the jurors on felony murder after they requested a recharge. See Division 5, supra. We disagree. The record shows that as the court began to assemble the defendants and their counsel for the requested recharge, the jury rang its buzzer, informed the court that it did not wish a recharge, and ten minutes later returned its verdict. "[W]here, after requesting a recharge, the jury returns a verdict before the trial judge has time to recharge, the trial judge's failure to recharge before the verdict is reached does not require reversal." *Harrell v. State*, 249 Ga. 48, 49 (1) (288 SE2d 192) (1982).

19. In his final enumeration, appellant complains that the court failed to charge the jury that the state had the burden beyond a reasonable doubt to disprove his affirmative defense of coercion. He further contends that the entire charge emphasized the state's theory of the case over his, and confused the jury. We find no error.

As to the first contention, the court gave general charges, as requested by the defendant, on coercion and the state's burden to prove all elements of each crime beyond a reasonable doubt. These charges were sufficient to inform the jury that appellant did not have the burden of persuasion concerning his affirmative defense. Moreover, appellant did not request a specific charge on this subject, and the court had no duty to charge it sua sponte. As to the second contention, we have reviewed the charge as a whole, and we find no error.

For the foregoing reasons, the convictions and sentences of Donnie James Smith are affirmed in part and reversed in part.

### 41815. Holly Johnson

20. Holly raises two issues on appeal. In her first enumeration, she raises the general grounds. We find no error. Based on the evidence presented in this case any rational trier of fact could have found her guilty beyond a reasonable doubt of the offenses of which she was convicted. *Jackson v. Virginia*, supra, 443 U. S.

21. In her second enumeration Holly contends that the superior court should have dismissed her convictions of aggravated assault and kidnapping because one of them must have been the underlying offense for the conviction of felony murder. In response, the state concedes that appellant should not have been sentenced for felony murder and both underlying felonies. However, the state further contends that only one underlying felony conviction need be vacated; that the aggravated assault was the initial felony which began the chain of events leading to Henderson's death; and that it is therefore the aggravated assault conviction which merged with the felony murder conviction and therefore ought to be vacated. We agree, *Blankenship v. State*, supra, 247 Ga., and vacate the aggravated assault conviction and affirm the kidnapping conviction.

For the foregoing reasons, Holly Johnson's convictions and sentences are affirmed in part and reversed in part.

*Judgment affirmed in Case No. 41813. Judgments affirmed in part and reversed in part in Case Nos. 41814 and 41815. All the Justices concur, except Gregory, J., not participating.*

DECIDED JULY 3, 1985 —
REHEARING DENIED JULY 23, 1985.

*Joseph W. Gudelsky,* for appellant (case no. 41813).
*Michael E. Bergin,* for appellant (case no. 41814).
*Kenneth D. Feldman,* for appellant (case no. 41815).
*Lewis R. Slaton, District Attorney, Margaret V. Lines, Joseph J. Drolet, Joyce Banks, Assistant District Attorneys, Michael J. Bowers, Attorney General, J. Michael Davis,* for appellee.

