**Donnie James SMITH,
Petitioner–Appellant,**

v.

**Ira KELSO, Warden,
Respondent–Appellee.**

No. 87–8658.

United States Court of Appeals,
Eleventh Circuit.

Jan. 25, 1989.

Michael Edward Bergin, Fairburn, Ga., for petitioner-appellant.

Paula K. Smith, Asst. Atty. Gen., Dept. of Law, Atlanta, Ga., for respondent-appellee.

Before TJOFLAT and EDMONDSON, Circuit Judges, and WISDOM *, Senior Circuit Judge.

---

* Honorable John Minor Wisdom, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

WISDOM, Senior Circuit Judge:

The primary question this habeas case presents is whether the petitioner's trial in the state court was fundamentally unfair because the conflict between the petitioner and his co-defendants was so substantial that the trial court should have granted the motion for a severance. On September 20, 1983, Jim Henderson was murdered by two rifle shots to the head as he lay in the back seat of Donnie Smith's automobile. Henderson's ex-wife Holly Johnson, her husband Bill Johnson, and Smith, Henderson's nephew, were jointly tried in a state court in Georgia for murder and for other criminal offenses. Bill Johnson was convicted of malice murder, aggravated assault, kidnapping, and concealing the death of another; Holly Johnson was convicted of felony murder, aggravated assault, kidnapping, and concealing the death of another; Donnie Smith was convicted of felony murder, assault, false imprisonment, felony murder, and concealing the death of another; he received a sentence of life plus twelve months.[1] Of the defendants, Smith alone now appears before this Court. He appeals the denial of his application for a writ of habeas corpus. We affirm.

## I.

The nature of the case requires a detailed statement of the facts. Jim and Holly Henderson were divorced in 1980. Holly moved to Illinois, where she met Bill Johnson. While there, Holly, who was on parole, stole a pistol from her roommate, an act which placed her at risk of being returned to prison. In 1983, Henderson asked her to return to Atlanta—with Johnson—to work for the family business, Carpet Cleaners of Georgia. He managed the company and represented himself as the owner. Henderson promised that after a short time he would let them have their own franchise. Before moving, Holly married Bill Johnson.

Frictions developed. Holly and Johnson honeymooned in Florida, but their trip ended abruptly after an argument. Holly left Johnson and went to Atlanta alone. While in Atlanta, she stayed with Jim Henderson, her ex-husband. Soon after, Henderson and Holly Johnson decided to find Bill in Florida, allegedly so that Holly could return his belongings to him. They rode to Florida with Donnie Smith, Henderson's nephew and an employee of the carpet cleaning business. After several days in Florida, they failed to find Johnson. Henderson was the first to return to Atlanta, taking the stolen pistol in his luggage. Holly Johnson and Donnie Smith followed a few days later.

Bill Johnson arrived in Atlanta within a few days of their return. He and Holly lived in an apartment rented by Henderson's company to store its equipment. They worked for Henderson. Relations among them soon soured. One witness testified that Donnie Smith threatened to kill Henderson after Henderson chased him with a weapon. Another witness testified that Holly asked Donnie Smith's brother, who was also an employee of the business, to kill Henderson. Henderson refused to return the stolen pistol to Holly and allegedly threatened to turn her over to the police. The Johnsons grew tired of the delays in receiving their franchise. The tensions existing in the group were augmented by Henderson's ongoing courtship of Umeiko Glass, a local florist.

Matters came to a head on September 19, 1983. On that day, the Johnsons learned that Henderson did not own the carpet cleaning business and could not guarantee them a franchise. The same day, Henderson became engaged to Umeiko Glass and presented her with a ring. Holly Johnson had owned the ring, given to her by Henderson. The Johnsons, infuriated by this and various personal slights, and by their failure to receive a franchise, resolved to leave Atlanta. Before doing so, how-

---

1. The Georgia Supreme Court affirmed, except that it found that Holly Johnson's conviction for aggravated assault and Donnie Smith's conviction for false imprisonment merged into their convictions for felony murders. Their convictions and sentences on those charges were accordingly vacated. *Johnson v. State*, 254 Ga. 591, 331 S.E.2d 578, 584, 589 (1985).

ever, they decided to retrieve the stolen pistol. Moreover, Holly wanted her ring.

Early on the morning of September 20, 1983, the Johnsons picked up Smith to take him to work. On the way, they went to Umeiko Glass's home, where Jim Henderson had spent the night. Bill Johnson and Jim Henderson proceeded then to the Johnsons' apartment in one car, while Smith and Holly Johnson drove another. Upon arrival, Smith was asked to sit outside; this was his usual role when business matters were discussed. Several minutes later Holly Johnson ran from the apartment and removed a .22 caliber rifle from the trunk of her car. Smith followed her inside to find Johnson fighting Henderson. Holly's intervention led to a three-way struggle for the gun between the Johnsons and Henderson. Eventually, Johnson gained control of the rifle and began hitting Henderson with it. Smith joined in the fray, "kidney-punching" Henderson onto the floor and holding him there. He testified that he did this to discourage more fighting, but Holly Johnson testified that Smith participated actively in beating Henderson. Henderson was beaten into unconsciousness. Johnson then began to tie Henderson's hands. Smith thought that Johnson would break Henderson's arms, so he offered to tie Henderson. At least, so he testified.

When Henderson regained consciousness, he agreed to obtain Holly's ring from Ms. Glass. He had buried the stolen pistol under Smith's parents' house, he said. Smith then went to look for the gun. Henderson remained bound at the apartment for the rest of the morning with the Johnsons standing guard over him, while Smith made three unsuccessful searches for the gun at his parents' house. After Smith's third trip, he and the Johnsons decided to go a final time to the house in search of the gun. Smith drove one car, with Bill Johnson in the passenger seat and Henderson, still tied, in the back seat; Holly Johnson drove a separate car. Again, they did not find the gun.

The group then separated, with Johnson and Smith driving around town, trying to coerce Henderson into disclosing where the gun was. Smith was again driving. Johnson was in the front seat with him. Smith testified that Johnson, in an effort to add to Henderson's fear, fired two shots into the back of the car, near Henderson's head. Eventually, Johnson fired two bullets into Henderson's head. The forensic evidence establishes beyond any reasonable doubt that all four shots came from the front passenger seat of the car. Smith and Bill Johnson left the body in a wooded area and returned home. Later that evening, Bill Johnson demanded that Smith dispose of the body.

The next day, Bill and Holly Johnson left town. Smith retrieved the body, placing it in the trunk of the car in which Henderson had been killed. He then made arrangements through his attorney to surrender to the police, and on the evening of September 22, 1983, two days after the murder, the car and body were turned over to the Fulton County police. Bill and Holly Johnson were arrested several days later in a small town in Mississippi.

The Johnsons and Smith were tried together, each represented by a different attorney. Bill Johnson accused Smith, testifying that Henderson and Smith had kidnapped him but had voluntarily let him go in the middle of the afternoon. He denied any additional knowledge of the events leading up to Henderson's death. There was little physical or other evidence to corroborate his testimony. Smith's testimony was substantially in accordance with the facts as we have stated them. The jury convicted all three defendants.

## II.

### A. *Severance*

 A trial court has certain broad discretionary powers and an appellate court has certain supervisory powers, but in this review of a district court's denial of a petition for a writ of habeas corpus the Court of Appeals may grant relief to a petitioner only if we find prejudice from a joint trial

amounting to fundamental unfairness.[2]

As long as persons indicted together are tried together, tension between co-defendants may taint the proceedings.

■ To determine whether a co-defendant has suffered actual prejudice from denial of his motion to sever, this Circuit has followed the holding in *United States v. Berkowitz* that "the essence of one defendant's defense" must be "contradicted by a co-defendant's defense" to justify severance.[3] The Court elaborated:

> "... we hold that the defense of a defendant reaches a level of antagonism (with respect to the defense of a co-defendant) that compels severance of the defendant, if the jury, in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant."[4]

■ We believe that proper application of this test requires that courts move step-by-step through the following four-step analysis.

(1) Do the alleged conflicts with co-defendants' defenses go to the essence of the appellant's defense?

(2) Could the jury reasonably construct a sequence of events that accomodates the essence of both defendants' defenses?

(3) Did the conflict subject the appellant to compelling prejudice?

(4) Could the trial judge ameliorate the prejudice?

The Balkanized defenses of the Johnsons and Smith certainly present colorable claims of prejudice. Johnson testified that he had been kidnapped by Smith and Henderson, and that he had left Henderson alive, alone with Smith, in the car in which Henderson was killed, on the road into the park where the body was found. Smith testified that the Johnsons kidnapped Henderson, that fear of the Johnsons prevented Smith from stopping them, and that Bill Johnson killed Jim Henderson. On the first day of pretrial hearings, Mrs. Johnson's trial counsel accurately predicted the internecine conflict that typified the defense:

> [W]hat this whole case is going to be is, Mr. Smith pointing the finger at my client and Mr. Johnson, and I will state candidly that I am going to point the

**2.** Although there are several possible grounds for finding prejudice, only the problem of antagonistic defenses is relevant to Smith's appeal. *See, e.g., Stevenson v. Newsome,* 774 F.2d 1558 (11th Cir.1985), *cert. denied,* 475 U.S. 1089, 106 S.Ct. 1476, 89 L.Ed.2d 731 (1986); *Demps v. Wainwright,* 666 F.2d 224, 227 (5th Cir. Unit B 1981), *cert. denied,* 459 U.S. 844, 103 S.Ct. 98, 74 L.Ed.2d 89 (1982).

The difficulty of determining when severance is required has prompted criticism of the presumption against severance. *See, e.g.,* Dawson, *Joint Trials of Defendants in Criminal Cases: An Analysis of Efficiencies and Prejudices,* 77 Mich. L.Rev. 1379, 1450–54 (1979). The problems with joint trials have made the federal presumption for joint trials unusual. The Uniform Rules of Criminal Procedure make severance a matter of right, unless the trial judge finds that material evidence would be lost by allowing severance. Rules of Criminal Procedure (U.L.A.) rule 472. Some states require that the prosecution establish the need for joinder on grounds other than "economy of time or expense". *See, e.g.,* Minn.R.Crim.P. 17.03, discussed in Dawson, at 1453 n. 318. Georgia is not such a state. Despite these criticisms, severance remains discretionary with the trial judge, and we can reverse only when a petitioner es-

tablishes that his trial was, in fact, fundamentally unfair.

**3.** 662 F.2d 1127, 1132–34 (5th Cir. Unit B 1981).

**4.** 662 F.2d at 1134. Although *Berkowitz* concerns a direct appeal from a federal conviction, its test provides helpful guidance in determining whether Smith should receive habeas relief. *See Demps,* 666 F.2d at 227, applying the Berkowitz case. By our reliance on direct appeals cases we do not mean to treat this Court's role in reviewing habeas petitions as identical with its role in reviewing direct appeals from federal trials. Although in this opinion we discuss the facts of the case in great detail, we recognize that most often in habeas cases the degree of deference owed to the state courts and the reviewing federal district court will weigh against such intensive sifting of the facts. *Compare, e.g., Berkowitz,* 662 F.2d at 1132–34 (conducting detailed review of facts in direct appeal) *with Demps,* 666 F.2d at 227 (applying *Berkowitz* but conducting brief review of facts). It is important to recognize, however, that the analytical steps involved in determining whether actual prejudice resulted from a joint trial are identical in direct appeals and in appeals from denied habeas petitions.

finger at Mr. Smith. And I feel that Mr. Johnson will, too.[5]

The strength of the disagreement notwithstanding, we hold that the trial judge did not err in denying Smith's motion for severance.[6]

(1) Do the alleged conflicts with co-defendants' defenses go to the essence of the appellant's defense?

■ The need for defendants to adjust their cases in reaction to co-defendants' choices flows inevitably from the fact of their being tried together. Severance is compelled only when a co-defendant has refuted those portions of a co-defendant's case that are necessary to find the defendant not guilty of the particular charged offense. Thus, this Court has refused to overturn a denial of a motion for severance where each defendant has argued that his own involvement in the crime did not rise to a level justifying culpability.[7] Although a defendant presenting this defense often attempts to bolster it by depicting a co-defendant as the central actor in the crime, we have consistently refused to find that this conflict goes to the heart of the defenses.[8] We have concluded that the jury could decide that neither defendant's involvement had been established beyond a reasonable doubt.[9] This conclusion has been applied even when a defendant directly contradicts a key portion of a co-defendant's testimony. In *U.S. v. Stephenson,* Stephenson admitted that he and his co-defendant had been at the scene of a robbery but argued that he had not participated in or known of his co-defendant's actions. His co-defendant said he was not at the scene of the crime and had been misidentified. This Court held that the jury could still have accepted the co-defendant's contention that he had been misidentified, even though Stephenson's testimony contradicted that of his co-defendant. This Court then affirmed the trial judge's denial of severance.[10]

At the same time, the court recognizes that the essence of a defendant's case is not limited to straightforward denials of complicity. The success of a defense may hinge on whether the jury believes the defendant's account of events, and a defendant's credibility may be undercut at many points not directly tied to that defendant's denial that he committed a crime. When a co-defendant so undermines a defendant's credibility that a jury would have difficulty evaluating the defendant's account of events objectively, there is a great possibility that the proceedings are infected with exactly the kind of prejudice the rules are

---

**5.** Smith's motion for severance is well-presented. He moved for severance before trial, during jury selection, during pretrial hearings, and during the trial. At each point there was sufficient evidence for the trial judge to predict the level of antagonism. For instance, soon after Smith's counsel moved for severance during jury selection, counsel for Mrs. Johnson predicted *that the case would involve antagonistic defenses.* The judge replied, "I don't think there is any doubt about that."

Smith's attorney did not move for severance after the testimony of Bill Johnson, whose testimony creates the primary conflict Smith complains of before this Court. This omission does not waive the motion, however. The trial judge must monitor the proceedings to insure that no defendant's rights appear to be prejudiced by a joint trial and should order severance if appropriate, even if no motion is made. *See Schaffer v. U.S.,* 362 U.S. 511, 516, 80 S.Ct. 945, 948, 4 L.Ed.2d 921, 925 (1960); *Berkowitz,* 662 F.2d at 1132.

**6.** We must first dispose of one, incorrect ground for rejecting Smith's request for severance. The

district judge, following the magistrate's reasoning, found no conflict over Smith's affirmative defense of coercion, on the ground that coercion is not a defense to murder. This reasoning does not apply to felony murder, for which Smith was convicted. The felony underlying Smith's felony murder conviction was false imprisonment; under Georgia law, coercion is a defense to false imprisonment. If Smith's affirmative defense to felony murder succeeds, then he would be found not guilty of the underlying felony and hence could not be found guilty of felony murder.

**7.** *See, e.g., United States v. Puig,* 810 F.2d 1085, 1087 (11th Cir.1987); *United States v. Caporale,* 806 F.2d 1487, 1510 (11th Cir.1987); *United States v. Magdaniel–Mora,* 746 F.2d 715, 719–20 (11th Cir.1984); *Berkowitz,* 662 F.2d at 1134.

**8.** *Id.*

**9.** *Id.*

**10.** 708 F.2d 580, 582 (11th Cir.1983).

designed to prevent. Hence, in *U.S. v. Johnson*,[11] the Fifth Circuit ordered severance in a situation very similar to that in *Stephenson*. In that case, Johnson's co-defendant testified that he accompanied Johnson during the commission of the crime for which they were charged but advanced the defense that he was acting as a police informant seeking to catch Johnson in the act. Johnson denied that he was present at the scene. This Court noted the conflict between the defenses,[12] but its opinion emphasized the damage done to Johnson by his co-defendant's allegations: his co-defendant depicted himself as "the good guy —only along for the ride",[13] Johnson as "the major culprit".[14] The court did not order severance simply because of the conflict, however, but emphasized as well that the damage to Johnson's credibility played a major role in its judgment, finding that his co-defendant's assertion worked a "definite hardship" on Johnson as he tried to prove he was not involved.[15]

Similarly, in *United States v. Gonzalez*, two men were found floating in a disabled boat that contained marijuana. One denied knowledge of the shipment. In support of his defense, he argued that his co-defendant had control over the boat; in making this contention, he testified that his co-defendant had attempted to conceal evidence. Unlike *Crawford*, the co-defendant did not reciprocate, but blamed a third party who was not a defendant. The jury could have believed both defendants' defenses, by finding that one knew nothing and that the other operated unknowingly prompted by an unindicted third party. This Court nevertheless found that the defenses were so antagonistic that severance should have been granted. Underlying the court's reasoning was the simple proposition that the co-defendant's tale of a third party rested on his credibility as a witness. By undermining his credibility, his co-defendant had subverted his case.[16]

■ Most conflicts between Smith and his co-defendants do not concern the essence of Smith's defense. A first category of conflicts that do not establish actual prejudice arises when a co-defendant undermines a defendant's credibility on peripheral matters, when that credibility is unlikely to decrease significantly his credibility as a witness testifying to the main facts of the case. Hence, conflicts over admission of evidence establishing that Smith spent time in a psychiatric institution after Henderson's murder do not justify severance; nor does the evidence weakly tending to implicate Smith in an attempt to destroy prosecution evidence justify severance.

■ Second, conflicts over aspects of a defense subsidiary or corollary to the central issues do not justify severance. Thus, conflicts over evidence establishing that Smith had fought with Henderson in the months before the murder; over evidence arguably impeaching a prosecution witness; over labelling prosecution exhibits as "Donnie Smith" exhibits; and over admitting evidence impeaching Mrs. Johnson, do not go to the heart of Smith's case in the way required by the actual prejudice standard.

■ Finally, conflicts over matters whose impact on the outcome is speculative do not meet this standard. Hence, conflicts over jury selection; over which defendant a marginally important witness would testify for; and over which trial counsel would make closing argument do

11. 478 F.2d 1129 (5th Cir.1973).

12. *See* Section IIA2 (discussing standard for conflict).

13. 478 F.2d at 1132.

14. *Id.* at 1133.

15. *Johnson* and *Stephenson* are not inconsistent. In *Stephenson*, the factual conflict arose over Stephenson's co-defendant's presence at the scene. Because Stephenson did not say he had seen his co-defendant commit the crime, he could not contradict his co-defendant on that score. Conversely, Johnson's co-defendant testified that he had seen Johnson commit the crime.

16. 804 F.2d 691, 695–96 (11th Cir.1986).

not justify severance.[17]

(2) Could the jury reasonably construct a sequence of events that accomodates the essence of both defendants' defenses?

There has been some conflict in interpreting *Berkowitz*'s requirement that a jury must necessarily disbelieve one defendant's story in order to believe the other's defense. Some courts have read the *Berkowitz* test as covering only the situation where the jury must find one defendant guilty when it chooses to believe another. In *Crawford*, for example, two people were arrested in a car that contained an illegal firearm. Each contended that the other owned the firearm. Lacking other evidence to determine ownership, the jury was compelled to convict the defendant it did not believe was telling the truth. *Magdaniel–Mora* interpreted *Crawford* and thus *Berkowitz* as applying only when the "sole defense of each was the guilt of the other".[18] In *Gonzales*, however, another panel of the Court ordered severance when the jury's options were not so constrained.

We interpret *Berkowitz* as accommodating both extremes. A defendant may establish a conflict in either of two circumstances: (i) when the jury could not logically "have believed both defendants' theories of defense";[19] or (ii) where the jury could not reasonably have accommodated both, for example, where a defendant's defense rests upon testimony by a witness who is impeached as a key part of a co-defendant's defense.

In this case, two conflicts pass this second test. The first arises from the testimony of Johnson that Smith and Henderson, acting together, kidnapped him; that Smith and Henderson fought with one another briefly while forcing him to accompany them on the day of the murder; that he last saw Henderson alive in Smith's car; that Smith had blood on him; and that he talked to Henderson after 8 p.m. the evening of the murder. Second, Smith's jail cellmate testified for Johnson and alleged that Smith confessed to murdering Henderson, that Smith said that he would blame "some guy down the hall", presumably Bill Johnson, and that he would "play crazy".

Bill Johnson's testimony directly contradicts Smith's defense and would create a conflict even under the restrictive interpretation of *Berkowitz*. Smith's cellmate also refutes Smith's contention that he acted under duress. In addition, this testimony depicts Smith as at times leading the Johnsons; although this portrait does not directly rebut Smith's defense of duress, it casts doubt on the credibility of his fear of Bill Johnson. This testimony thus conflicts with Smith's defense under both interpretations of *Berkowitz*.

(3) Has the defendant established compelling prejudice?

This is essentially a requirement that the defendant prove the conflict was not harmless. *See Stevenson*, 774 F.2d 1558; *Demps*, 666 F.2d at 227. Smith has not met this requirement. In reaching this conclusion, we rely primarily on the fact that evidence other than Bill Johnson's testimony was sufficient to convict Smith. By his own admission, Smith aided in the false imprisonment of Henderson. That crime was the underlying felony in Smith's felony murder conviction. Smith's primary defense to the false imprisonment charge was that he had acted under duress.

The jury could have believed, based on testimony establishing animosity between Smith and Henderson, that Smith was a willing participant, even if a somewhat passive one. It might also have found that Smith did not take advantage of ample opportunities to obtain help from the police. The fit between the other evidence and the jury's verdict suggests that, even if jury had not heard Bill Johnson's testimony, it

---

17. In addition, nearly all these issues were resolved in ways compatible with Smith's interests. He would therefore have difficulty establishing prejudice. *See* Section IIA3.

18. 746 F.2d at 720 (*quoting Crawford*). *See also Gonzalez*, 804 F.2d at 698 (Hoffman, Senior District Judge, dissenting) (limiting *Berkowitz* to facts of *Crawford*).

19. *Stephenson*, 708 F.2d at 582.

could have convicted Smith as it did.[20] Any possible error from allowing the conflicting defenses is therefore harmless.

(4) Could the trial judge protect against prejudice?

■ Even when a defendant suffers some prejudice from a joint trial, he need not be granted a separate trial unless the trial judge could not cure the prejudice.[21] We have found no risk of compelling prejudice. Nevertheless, it is worth noting that the trial judge limited the prejudicial effect of the evidence and testimony which underlie Smith's allegations through careful instructions to witnesses and counsel. Cross-examination by Smith's counsel and other counsel also mitigated the prejudice flowing from any testimony. Finally, whenever counsel for the three defendants clashed, almost every conflict was resolved in Smith's favor. In short, to the extent there were conflicts, Smith was favored by the court's rulings.

## B. *Ex Parte Communication*

■ Smith next asks for reversal on the ground that the trial judge talked ex parte with the jurors during their deliberations. This communication, while improper, did not prejudice Smith's defense.

Late on a Friday afternoon, counsel for all parties agreed that the trial judge should ask the jurors when they would return with a verdict. The judge informed trial counsel that the following events took place:

> They asked if they could ask me a question and I responded no, that they couldn't, that if they needed to ask a question we would have to assemble everybody and ask the question formally on the record. They then proceeded to ask the question anyway, which was "Did we get a charge on felony murder?" And I responded, "Yes, you did get a charge on felony murder." Then they started talking about what it was and I said, "I cannot answer that. If you

wish to have a recharge on felony murder we can assemble everybody and I will recharge you on felony murder that I charged you before." And they said yes, they would like that.

The judge's recollection is confirmed by the bailiff who accompanied him. Upon the judge's verifying that the jury had been charged on felony murder, one juror said something to the effect of "There, I told you so". The jurors returned with a verdict approximately ten minutes after this exchange, before they were recharged on felony murder.

The judge relayed this conversation to trial counsel as soon as he returned to the courtroom. Because court was not in session at that time, Smith's counsel did not object immediately. Nor did he object when court reconvened to hear the jury's verdict, waiting instead until the sentencing hearing on the following Monday. The Georgia Supreme Court held that this delay waived Smith's objection to the ex parte communication and, citing *Williams v. State*, 312 S.E.2d 40 (Ga.1983), that the court's statements to the jury "were not so prejudicial as to deny a fair trial".

Over the weekend, after the verdict and before sentencing, counsel received a telephone call from a juror, who explained that the jury had been confused on the requirements for felony murder. Smith's attorney inferred from this conversation that the jury meant to convict Smith only of a lesser included felony, but not of felony murder. Smith contends that the trial judge, by telling the jury it had already been instructed on felony murder, discouraged it from seeking clarification. His ex parte conversation with the jury thereby forced the jurors to rely on their own notes, which had already failed to settle the question whether they had even been instructed on felony murder, much less to illuminate what the instructions were.

---

20. *See, e.g., Dorsey,* 819 F.2d at 1058 (consistency of verdict with evidence establishes absence of compelling prejudice); *Caporale,* 806 F.2d at 1511 (same).

21. *See, e.g., Dorsey,* 819 F.2d at 1058; *United States v. Watkins,* 811 F.2d 1408, 1410 (11th Cir.1987).

We find no ground for reversal, however. First, the scenario put forth by Smith's counsel is nothing more than speculation. Smith's counsel could not articulate clearly what the impact of the judge's short, truthful response to the jury's simple question might have been. Second, as we noted above, the verdict is consistent with the facts and therefore does not by itself manifest any confusion on the part of the jury. The situation here contrasts with other cases where the prejudiced effect of ex parte communications was clear.[22]

## C. *Brady and the Jury Instructions*

 Two other issues remain. First, Smith contends that the State failed to disclose a statement made by Holly Johnson that she was afraid of her husband Bill. Smith argues that this statement would bolster his affirmative defense of coercion. He concludes that the State's failure to disclose the statement violated his due process rights, as articulated in *Brady v. Maryland.*[23] A new trial is not warranted unless the evidence creates a reasonable doubt that would not otherwise have existed.[24] Because other evidence provided the jury with ample basis for concluding that Bill Johnson could have coerced Smith, Holly Johnson's statement is cumulative. Smith has thus failed to establish that the prosecution's failure to disclose Holly Johnson's statement undermines confidence in the outcome of his trial.[25]

 Smith also argues that the trial judge improperly failed to instruct the jury that the State had the burden of disproving his affirmative defense of coercion beyond a reasonable doubt. Smith relies upon *U.S. v. Mitchell,* which declared that in federal criminal trials the Government has the burden of disproving at least one element of

duress beyond a reasonable doubt.[26] *Mitchell,* however, establishes only a federal criminal rule, not a constitutional right. The Supreme Court has not held states to the standard announced for the federal government in *Mitchell.*[27] In Georgia, the state does not have the burden of disproving the elements of a coercion defense.[28] Because there is no state provision analogous to the federal rule validated in *Mitchell,* Smith's argument is meritless.

## III.

The district court's denial of Smith's petition for a writ of habeas corpus is AFFIRMED.

TJOFLAT, Circuit Judge, specially concurring:

I concur in the court's judgment that the petitioner did not receive a fundamentally unfair trial in violation of the due process clause. I write separately because I disagree with the majority's approach to the petitioner's due process claim—that the trial judge denied the petitioner a fair trial by not granting him a severance from his co-defendants.

To decide the merits of a petitioner's claim that the state trial court denied him due process of law by refusing to grant him a severance, a federal habeas court must begin by examining the record of the trial proceedings that took place before the trier of fact—in this instance, the jury. If that record, considered as a whole, does not demonstrate that the petitioner received a fundamentally unfair trial, the habeas court's inquiry ends, and the petitioner's claim must be denied. If, however, the record demonstrates the contrary, the habeas court must proceed a step further and

---

**22.** *See, e.g., United States v. Howard,* 506 F.2d 865, 867 (5th Cir.1985) (ex parte communication of report that defendant had "been in trouble before" created prejudice against defendant).

**23.** 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**24.** *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976).

**25.** *See U.S. v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 3381–82, 87 L.Ed.2d 481, 491 (1985).

**26.** 725 F.2d 832, 836 (2d Cir.1983).

**27.** *See Patterson v. New York,* 432 U.S. 197, 210, 97 S.Ct. 2319, 2327, 53 L.Ed.2d 281 (1977).

**28.** *Johnson v. State,* 331 S.E.2d at 588–89.

decide whether the trial judge, rather than some other causative agent—such as failed trial strategy or incompetent counsel—rendered the trial fundamentally unfair. The judge can be held to have denied the petitioner due process if the reviewing court can reasonably conclude that the judge should have granted the petitioner's motion for severance and that his action in denying the motion rendered the trial unfair.

In determining whether the conduct of the trial judge produced the unfair trial, we look to the portion of the record that was before the judge at the time the defendant presented his motion for severance and ask, "Should the judge, on the basis of the record then before him, have concluded that the movant's trial must be aborted because the trial has been rendered fundamentally unfair?" If the answer to this question is in the negative, the movant's due process claim must fail—even though subsequent events, during the course of the trial, may prompt a "Monday morning quarterback" to conclude that the defendant's trial turned out to be unfair.

The rejection of a severance motion operates to deny the defendant a fair trial only when the rejection occurs after the prejudicial events described in the motion have taken place.[1] When the rejection occurs prior to trial, the defendant cannot have been prejudiced by the ruling—in the sense that he received an unfair trial—because the trial has not yet occurred and the court's ruling is, by definition, provisional; that is, the ruling is inherently subject to reconsideration as the proceedings progress.

In the case before us, petitioner made a pretrial motion for severance on the ground that the defense of a codefendant was antagonistic to his own, but did not renew his motion for severance following the testimony of the codefendant which, for the first time, actually brought the allegedly antagonistic defense before the jury. Under what I submit is the correct approach to this severance/fair trial problem, I would conclude that the trial judge did not deny the petitioner due process because, at the time the court denied his severance motion, no events had occurred that worked an undue prejudice upon him. I am troubled by the majority's novel suggestion that because the petitioner made a pretrial motion for severance, the trial judge had a duty—imposed by the due process clause—to monitor the progress of his trial and grant him a severance sua sponte if the judge perceived that the petitioner had been irreparably prejudiced by his codefendant's testimony.[2] The majority seems to overlook that the double jeopardy clause [3] grants a defendant the right to a verdict at the hands of the jury that has been sworn to try his case. If the trial judge denies him this right by declaring a mistrial—without the defendant having requested one *at that time*—the judge will likely have acquitted the defendant of the charge for which he is on trial.

To support its rationale, the majority cites dicta from the Supreme Court's opinion in *Schaffer v. United States*, 362 U.S. 511, 516, 80 S.Ct. 945, 948, 4 L.Ed.2d 921 (1960), and our opinion in *United States v. Berkowitz*, 662 F.2d 1127, 1132 (5th Cir. Unit B Dec. 1981).[4] *See ante* at 1569 n. 5. Upon careful reading, I conclude that these cases do not support the majority's position.

---

**1.** For example, if the prejudicial event described in the motion concerns the admission of evidence, a fair trial is denied after the evidence is either admitted or excluded and the undue harm caused thereby cannot be alleviated.

**2.** The majority states that "[t]he trial judge must monitor the proceedings to insure that no defendant's rights appear to be prejudiced by a joint trial and should order severance if appropriate, *even if no motion is made.*" *Ante* at 1569 n. 5 (emphasis added).

**3.** The fifth amendment to the United States Constitution provides that no person shall "be sub-

ject for the same offense to be twice put in jeopardy of life or limb." This provision is applicable to and binding upon the states through the fourteenth amendment. *See Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

**4.** In *Stein v. Reynolds Securities, Inc.* 667 F.2d 33 (11th Cir.1982), this court adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981.

In *Schaffer*, the four petitioners were charged in a three count indictment. The first three counts charged the petitioners separately with interstate shipment of stolen goods; the fourth count charged them with conspiracy to commit these substantive offenses. At the conclusion of the government's case, the court dismissed the conspiracy count, and the petitioners moved for severance on the ground that the substantive counts were so unrelated that to proceed further would work an unfair "spill over" prejudice to the respective petitioners that could not be overcome by curative instructions to the jury. The court denied the petitioners' motions, and the jury convicted them of the substantive offenses. The court of appeals affirmed. The Supreme Court granted certiorari to consider whether the joinder of petitioners in one indictment had violated Fed.R.Crim. P. 8(b). The Court concluded that their joinder had not been improper. The Court also concluded that their joint trial had not caused them the sort of undue prejudice that should have been remedied by a Fed. R.Crim.P. 14 severance. In reaching this conclusion, the Court did say, as the majority notes, that "the trial judge has a continuing duty at all stages of the trial to grant a severance if prejudice does appear," 362 U.S. at 516, 80 S.Ct. at 948; the Court did not say, however, that the trial court has a duty to grant severance sua sponte.

*Berkowitz* similarly provides no support for the majority's rationale. The defendants in *Berkowitz* moved for severance at the conclusion of a codefendant's testimony which was antagonistic to their defense. 662 F.2d at 1132. The *Berkowitz* court held that severance was not necessary because insufficient prejudice had been shown. In dicta, the court stated: "The failure to move for severance before trial, of course, is not fatal to appellants' claims. The district court has a continuing duty to monitor the entire trial for prejudice and to order severance if such prejudice does arise." *Id.* As in *Schaffer*, the procedural background of *Berkowitz* reveals that the court meant only that severance must be

granted upon proper motion when prejudice is shown to have arisen.

*Schaffer* and *Berkowitz* therefore do not stand for the proposition that once a defendant moves for severance the court has a continuing duty to grant a severance sua sponte whenever prejudice seems to appear during the course of the trial. Rather, as the Ninth Circuit has explained:

> Motions to sever must be timely made *and properly maintained,* or the right to severance will be deemed waived. To preserve the point, the motion to sever must be renewed at the close of all evidence.... Premature motions to sever not diligently pursued as the prejudicial evidence unfolds cannot serve as insurance against an adverse verdict.

*United States v. Kaplan,* 554 F.2d 958, 965–66 (9th Cir.1977) (citations omitted) (emphasis added). *See also United States v. Benz,* 740 F.2d 903, 913 (11th Cir.1984). In the instant case, petitioner did not renew his motion for severance after the allegedly prejudicial testimony was given. Were I writing for the majority, I would have confined my inquiry to whether, *at the time petitioner made his motion for severance,* sufficient prejudice existed to permit us to conclude that the trial court's denial of the motion must be deemed a denial of due process.